**VERMONT DEPARTMENT OF PUBLIC SERVICE, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Vermont Electric Power Company, Intervenor.**

**No. 85–1849.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 20, 1986.

Decided April 28, 1987.

Harvey L. Reiter, with whom William I. Harkaway, Washington, D.C., and Gerald R. Tarrant, Montpelier, Vt., were on the brief for petitioner.

John Conway, F.E.R.C., Washington, D.C., for respondent. Barbara J. Weller, Deputy Sol. and Joseph S. Davies, Atty., F.E.R.C., Washington, D.C., were on the brief for respondent.

A. Karen Hill, F.E.R.C., Washington, D.C., entered an appearance for respondent.

George F. Bruder, Washington, D.C., for intervenor.

Before STARR and BUCKLEY, Circuit Judges, and GASCH,* Senior District Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This case calls upon us to review an agency's interpretation of an electric utility contract. Specifically, the Vermont Department of Public Service ("VDPS") challenges the Federal Energy Regulatory Commission's determination that VDPS's contract with Vermont Electric Power Company ("VELCO") for transmission of power permitted VELCO unilaterally to make a series of rate filings with the Commission disaffirming certain supervisory powers reserved to VDPS in the original transmission contract. After careful review, we conclude that FERC's interpretation of the contract was amply supported both factually and legally. We therefore deny the petition for review.

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 294(d).

## I

The background of this case can be traced thirty years back, to the winter of 1956. In January of that year, the State of Vermont through its Public Service Commission ("PSC") executed a contract for the wholesale purchase of hydroelectric power from the Power Authority of the State of New York ("PASNY"). Under this contract, designated as the "St. Lawrence Contract S–2" by the contracting parties, PASNY agreed to supply Vermont with power generated by the St. Lawrence River project then under construction.[1] With this power supply thus assured, Vermont's PSC then entered into a separate contract in 1957 with VELCO for delivery of power supplied by PASNY under the S–2 contract. Because the current controversy revolves around the provisions and interrelation of these two contracts, each merits fuller description.

The St. Lawrence Contract S–2 imposed two primary obligations on PASNY: *first*, to supply from its St. Lawrence project 100,000 kilowatts of "firm" power for the life of the contract;[2] *second*, to provide from the St. Lawrence project classes of power other than firm power to the extent that other classes became available and Vermont wished to secure them.[3] The contract provided for an initial term through June 30, 1985; it also provided for renewal "upon such conditions as may be agreed upon by the parties."[4]

The transmission contract of 1957 between Vermont and VELCO set forth a comprehensive framework for delivering power obtained under the PASNY–Vermont contract to utilities throughout the State.[5] Many of the provisions of the 1957 contract defined VELCO's transmission obligations by reference to Contract S–2. In Article I, for example, section 1.1 required VELCO to construct facilities as approved by the State "adequate to (i) receive ... 100,000 kilowatts of firm electric power and such power of other classes as may be purchased ... in accordance with the St. Lawrence Contract S–2, and (ii) to deliver such power ... to allottees of the State at such locations ... and at such delivery voltages as the State may specify." Sections 1.3 and 1.4 elaborated the approval authority conferred upon the State in section 1.1 by specifying that whether these facilities were those initially constructed by VELCO or subsequent additions or extensions, they had to be "as approved by the State."

In addition to prescribing the facilities to be provided, the 1957 contract detailed the services VELCO was to perform by specific reference to Contract S–2. Article II imposed two duties on VELCO. Section 2.1 of Article II required it to deliver "St. Lawrence power"; section 2.2 required it to deliver "Other Power," the latter in apparent recognition that the facilities constructed pursuant to Article I would have capacity to transmit power in addition to that obtained under S–2 purchases. "St. Lawrence power," referred to in section 2.1, was defined by section 0.2 as follows:

> Whereas, the State has entered into a contract dated January 25, 1956, designated St. Lawrence Contract S–2, with Power Authority of the State of New York (hereinafter referred to as Power Authority) whereby Power Authority has undertaken to sell and deliver to the State 100,000 kilowatts of firm electric power, to be transmitted by Power Authority from its St. Lawrence River Power Project to delivery points ... located on the New York-Vermont state boundary, and also to sell and deliver to the State power of classes other than firm if such power becomes available and the

---

1. St. Lawrence Contract S–2 ("Contract S–2" or "S–2") is reproduced in the Record ("R.") at 162–85.

2. Contract S–2 defines "firm power" as "power which is always available except when the operation of [PASNY's] facilities is suspended, interrupted, interfered with or curtailed due to uncontrollable forces." Art. I, § 2(a), R. at 165.

3. *See* Contract S–2 art. I, § 1; *id.* art. V.

4. *Id.* art. VII(a).

5. The transmission contract of 1957 (which will be referred to variously as the "transmission contract" and the "1957 contract") is reproduced in R. at 119–45.

State elects to purchase it, all classes of such power being hereinafter referred to as St. Lawrence power.

1957 Contract § 0.2, R. at 122.

VELCO and Vermont likewise fixed the term of the 1957 contract by reference to the S–2 contract. The original term of the 1957 contract was to last through June 30, 1985, the day on which Contract S–2 expired.[6] Section 10.3, however, provided for renewal under the following terms:

> The State at its option, may renew this agreement upon the same terms and conditions as herein stated for the purpose of providing transmission services and facilities for the transmission of St. Lawrence power or other electric power and energy from sources without the State of Vermont for use, distribution or sale within the State of Vermont, such renewal term to be for such period not exceeding twenty-five years as the State shall elect; notice in writing of such renewal to be given by the State to the Corporation on or before June 30, 1984. This contract may be renewed upon such other terms and conditions as may be agreed upon by the parties.

Vermont exercised this renewal provision in September 1969, when the parties extended the 1957 contract through June 30, 2000. The renewal agreement provided for further renewal through the year 2010 and adjusted the rate of return under the contract but otherwise left intact the 1957 contract. R. at 157–58.

Much of the remainder of the 1957 contract was devoted to specifying the terms and conditions under which "St. Lawrence power" was to be delivered. The contract appeared, in contrast, to leave the terms and conditions for delivery of "other power" to the agreement of the parties. Section 2.2 provided:

> Other Power—In the event the State, during the term of this contract, shall acquire power for transmission within Vermont from sources outside the state other than those enumerated in St. Law-

rence Contract S–2, the same may be transmitted over the transmission facilities provided for in paragraphs 1.3 and 1.4 hereof to such extent as capacity, not otherwise used or reserved for use by contracts or arrangements made pursuant to paragraph 2.5 hereof for the transmission of firm power within the state, shall be then available, upon such terms and conditions as the parties hereto shall determine.

Of especial pertinence to the issues before us, in a number of provisions in the 1957 contract, Vermont expressly reserved authority to override VELCO management decisions. The most important of Vermont's supervisory powers relate to VELCO's construction of "initial" and "subsequent" facilities. Those powers are enumerated in sections 1.1, 1.3, and 1.4, which we have already described. The remaining, non-construction related supervisory powers permit the State to control the use of transmission facilities *of* others, use of VELCO's facilities *by* others, and expenditures for engineering studies.[7]

As contemplated by the 1957 contract with respect to non-St. Lawrence power, Vermont subsequently entered into three supplemental agreements with VELCO fixing the terms and conditions for transmission of what the agreement denominated (in section 2.2) as "other power." In 1961, the parties executed an agreement for transmission through December 31, 1979 of power purchased from PASNY's Niagara Project. Almost two decades later, an agreement in 1980 between VELCO and Vermont provided for the former's transmission through June 30, 1985 of a purchase of power from the Niagara Project to succeed the Vermont-PASNY 1961 purchase agreement. Finally, in 1980 VELCO agreed to transmit from October 1, 1980 through September 30, 1985 power that Vermont purchased from Hydro Quebec. In 1982, however, Vermont interrupted its Hydro Quebec purchase and substituted for it power purchased from Ontario

---

6. *See* 1957 Contract art. X, § 10.2, R. at 142.

7. These supervisory powers are enumerated, respectively, in sections 2.4, 2.5, and 7.1 of the 1957 Contract, R. at 127, 128 & 138–39.

Hydro. VELCO nonetheless continued delivering this substituted Canadian power under the 1980 Hydro Quebec agreement. Each of these "other power" transmission agreements expressly set forth the amount, class, and source of the power, provided for no charges in addition to those prescribed in the 1957 contract, and, importantly, stated that "[o]ther terms and conditions of [VELCO's] performance [would] be the same as those contained in the 1957 contract."[8]

As VELCO's delivery of power to Vermont falls within the jurisdiction of the Federal Energy Regulatory Commission, VELCO duly filed the 1957 contract and the various supplemental agreements with the Commission.[9]

Clouds portending the storm of controversy which has now erupted began to gather in the spring of 1985. Those were the waning days of Vermont's S-2 purchase from PASNY (now known as the New York Power Authority, or "NYPA"), which was due to expire June 30, 1985. Also nearing their respective ends were the 1980 supplemental agreement under which VELCO agreed to transmit Vermont's purchase of power from NYPA's Niagara Project, due to expire June 30, 1985, and the 1980 agreement for transmission of Hydro Quebec power, due to terminate September 30, 1985.

With the approach of these termination dates, Vermont—through VDPS, the most recent avatar of the Public Service Commission—began two sets of negotiations: with NYPA for a purchase agreement to replace the expiring Contract S-2; and with VELCO for a transmission agreement to cover the new purchase. These efforts were only partially successful. VDPS reached an interim agreement with NYPA for month-to-month purchases of power to begin July 1, 1985, the day after Contract S-2 expired. This power was to come in part from NYPA's St. Lawrence project and in part from its Niagara Project.[10] VDPS was less successful, however, in reaching an agreement with VELCO for transmission of this 1985 NYPA purchase. Specifically, VELCO and VDPS could not agree whether the supervisory powers of the 1957 contract applied to transmission of the new NYPA purchase. VELCO took the position that its recognition of Vermont's supervisory powers was no longer necessary or appropriate: no longer necessary, VELCO believed, because these powers attended only the transmission of power purchased under the expiring Contract S-2; and no longer appropriate because since 1956 Vermont had receded considerably in prominence as a VELCO customer, accounting in 1985 for a modest 20% of VELCO's revenues.[11]

Having failed to conclude an agreement for transmission of Vermont's 1985 NYPA purchase, VELCO unilaterally made three separate filings with the Commission that set out the terms and conditions under which it would transmit Vermont's power. On June 28, 1985, VELCO filed notice of cancellation of service under the 1957 contract for transmission of Contract S-2 "St. Lawrence power," under the 1980 supplemental agreement for transmission of Niagara Project power, and under the 1980 supplemental agreement for transmission of Hydro Quebec power. But VELCO did not propose to leave Vermont out in the cold; in the same filing, VELCO committed

8. *See* R. at 147–52. VELCO could provide for transmission under the "other power" agreements at no additional charge because under the 1957 contract, Vermont pays, for the life of the S–2 Contract, for all VELCO costs not covered by revenues from other customers. *See* Notice of VELCO Regarding Transmission Service Rendered to the State of Vermont, FERC No. ER 85–595, at 4 (filed June 28, 1985) [hereinafter "June 28 filing"], R. at 1, 4.

9. *See* June 28 filing, *supra* note 8, at 4–7, R. at 4–7; *see also* 16 U.S.C. § 824d(c). Apparently through inadvertence, VELCO did not file the

September 1969 agreement renewing the 1957 contract or a notice of cancellation of the 1961 Agreement for transmission of Vermont's initial purchase of Niagara Project power until June 28. *Id.* The Commission accepted these filings in one of the orders that Vermont now challenges, *Vermont Elec. Power Co.*, 32 F.E.R.C. ¶ 61,445 (1985), R. at 239; Vermont does not, however, challenge these aspects of the Commission's order.

10. *See* R. at 296–325.

11. *See* June 28 filing, *supra* note 8, at 2, R. at 2.

to transmitting the 1985 NYPA purchase temporarily, treating it for purposes of rate calculation as if it were Contract S–2 power but reserving the right to terminate that commitment on 60–days' notice. To allow the temporary arrangement to take effect as soon as Contract S–2 expired, VELCO asked the Commission to waive the requirement set forth in Section 205 of the Federal Power Act, 16 U.S.C. § 842d(d), that new rate schedule filings take effect no sooner than 60 days after filing. Waiver was especially appropriate, VELCO believed, because its June 28, 1985 filing made no changes in VELCO's charges to Vermont; the filing was, in effect, merely designed to maintain temporarily the *status quo* while the two parties continued negotiating.[12]

In its second filing, dated July 31, 1985, VELCO provided notice that it was cancelling the temporary rate schedule filed the preceding month, and replacing it with a permanent rate schedule for transmission of Vermont's 1985 NYPA purchase. Under the permanent schedule, as under the temporary one, VELCO would not raise the rates charged Vermont. In fact, only one telltale difference distinguished the June and July filings from the contractual arrangements that preceded them. To Vermont's chagrin, VELCO's filings recognized none of the former's supervisory powers created by the 1957 contract.[13] VELCO had, in effect, declared the renewal of its pre–1957 independence from the watchful eye of state authorities in Montpelier.

VELCO's third filing was made on August 7, 1985. In it, VELCO proposed to extend the terms for transmission of the 1985 NYPA purchase (set forth in its July schedule) to transmission of power that Vermont was purchasing from Ontario Hydro. VELCO also requested a waiver of the 60–day statutory notice requirement to permit this filing to take effect October 1, 1985, the day after expiration of the agreement to transmit Hydro Quebec power, under which, it will be recalled, VELCO had been transmitting Ontario Hydro power.[14]

Vermont countered with a comprehensive attack before FERC against all of these unilateral filings. VDPS's primary contention was that the supervisory powers reserved to Vermont in the 1957 contract governed transmission of Vermont's 1985 NYPA purchase. Because VELCO's filings omitted these contractual concessions which Vermont deemed it duty bound to honor, the filings were alleged to fly in the teeth of the well-known *Mobile-Sierra* doctrine.[15] VDPS also objected to VELCO's requests for waiver of the statutory notice requirement with respect to its June 28 and August 7, 1985 filings, arguing that the Commission should delay giving them effect pending a hearing to determine their validity.

In an order dated September 30, 1985, the Commission accepted VELCO's filings. *Vermont Electric Power Co.*, 32 F.E.R.C. ¶ 61,445, at 62,021 (1985). Relying primarily on its interpretation of sections 0.2, 2.2, and 10.3 of the 1957 contract, *quoted supra*, the Commission concluded that VELCO's submissions did not violate *Mobile-Sierra*. The Commission accepted VELCO's reasoning that section 2.2 of that agreement left open *all* terms and conditions for transmission of "other power," including the existence and extent of Vermont's supervisory powers. *Id.* at 62,024. Thus, in the Commission's view, the supervisory

---

12. *Id.* at 3–5, R. at 3–5.

13. VELCO's July 31 filing is reproduced in R. at 46–73.

14. VELCO's August 7, 1985 filing is reproduced in R at 90–97.

15. *See* Motion of VDPS to Intervene 4–12 (Aug. 14, 1985), R. at 200–08. As this court has recently described it, "[u]nder the well-settled doctrine known as *Mobile-Sierra,* the legality of a proposed rate increase by a seller of electric power turns on the terms of the contract governing the relationship between the purchasers and seller of electricity." *Holyoke Water Power Co. v. FERC,* 799 F.2d 755 (D.C.Cir.1986) (footnote omitted); *see also United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pac. Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed.2d 388 (1956); *Richmond Power & Light v. FPC,* 481 F.2d 490, 492–93 (D.C.Cir.), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973).

powers specified elsewhere in the 1957 contract governed only the transmission of "St. Lawrence power." According to the Commission, when in 1969 Vermont exercised its option under section 10.3 to renew the 1957 contract "upon the same terms and conditions as herein stated ... for the transmission of St. Lawrence power or other electric power," *Vermont secured only the rights that it originally enjoyed under the 1957 contract.* Those were:

> (1) to receive transmission service for Contract S–2 power under the terms and conditions specified and (2) to receive transmission service for other power under terms and conditions to be mutually agreed upon.

*Id.* at 62,025. "St. Lawrence power," it will be recalled, was defined in section 0.2 of the 1957 contract as power obtained pursuant to Contract S–2; thus, when S–2 expired, so too did Vermont's supervisory powers. The Commission buttressed its interpretation by noting that the parties had, over the years, negotiated the several supplemental agreements fixing the terms and conditions for transmission of non-Contract S–2 power:

> The parties thus appear to have been operating on the premise that non-Contract S–2 power required mutual agreement as to terms.

*Id.* Since, the Commission reasoned, Vermont's 1985 NYPA purchase was not "St. Lawrence power," section 2.2 required the parties to agree on *all* terms and conditions for its transmission. In the absence of agreement, VELCO properly could file rates unilaterally to govern its transmission. *Id.*

In its September 1985 order, the Commission also granted VELCO's request for waiver of the statutory notice requirements. FERC determined that it was appropriate to allow the filings to take effect immediately after expiration of the transmission contracts which the filings replaced. *Id.* It denied VDPS's request for a hearing, concluding that a hearing would serve no useful purpose, since VELCO's filings did not result in a rate increase or otherwise raise issues necessitating factual inquiry. The question was solely one of contract interpretation. Finally, determining that the renewed 1957 contract imposed on VELCO a continuing obligation to deliver non-Contract S–2 power, the Commission designated that contract as a supplement to VELCO's filings. *Id.* at 62,025; *see supra* note 9.

VDPS thereupon sought rehearing. It renewed, with added vigor, its contention that VELCO's filings violated *Mobile-Sierra*. In addition, it asserted that FERC's September 30, 1985 order was flawed in three other respects: *first*, that FERC granted waiver of statutory notice requirements without "good cause," as required by section 205 of the Power Act, 16 U.S.C. § 824d(d); *second*, that by allowing VELCO in its July 1985 filing to exercise the cancellation provision in its June filing before FERC had accepted that filing, the Commission contravened the "filed rate" doctrine and the ban on retroactive ratemaking, *see Southern California Edison Co. v. FERC,* 805 F.2d 1068, 1070 n. 2 (D.C.Cir.1986); *see also Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577–78, 101 S.Ct. 2925, 2930–31, 69 L.Ed.2d 856 (1981); and *third*, that the Commission's refusal to suspend the effectiveness of the filings pending a hearing on their reasonableness had the improper effect of shifting to Vermont the burden of proving the filed rate schedules unjust and unreasonable. *See Vermont Electric Power Co.,* 33 F.E.R.C. ¶ 61,287, at 61,575, 61,576 (1985).

The Commission denied VDPS's request for a rehearing. *Id.* In addressing VDPS's *Mobile-Sierra* argument, FERC elaborated its earlier explanation why VELCO's filings had not abrogated Vermont's supervisory powers. The Commission explained that the 1957 contract had tied those powers to transmission of power purchased under the St. Lawrence Contract S–2. Since, in the Commission's view, Vermont's 1985 NYPA purchase was not an extension of Contract S–2, and therefore did not constitute "St. Lawrence power," Vermont's supervisory powers had expired on June 30, 1985, S–2's expiration date. *Id.* at 61,576–77. The Commission further concluded that VELCO's filings violated nei-

ther the "filed rate" doctrine nor the ban on retroactive ratemaking. For one thing, FERC noted, the filings did not increase rates charged to Vermont. For another, VELCO had not invoked the power to cancel the temporary schedule filed in June 1985 until the following month, and had asked that the cancellation take effect more than 60 days after it invoked the cancellation provision. *Id.* at 61,577. Finally, the Commission discerned no injustice in accepting VELCO's filings without a hearing; among other reasons, FERC found no issue of fact to justify one. *Id.* at 61,578.

This petition for review followed.

## II

In seeking review of FERC's orders, VDPS renews the primary objections it pressed before the Commission.[16] Stated briefly, there are three: *first,* that FERC improperly construed the 1957 contract to permit VELCO unilaterally to file schedules that did not recognize Vermont's supervisory powers; *second,* that FERC's waiving statutory notice requirements for VELCO's June and August 1985 filings violated (a) the Federal Power Act, which requires "good cause" be shown to justify such a waiver, (b) the "filed rate" doctrine, which requires that customers of utilities be charged only on the basis of legally filed rates, and (c) the ban on retroactive ratemaking, which prohibits the Commission from substituting unfiled rate schedules for those properly filed; and *third,* that FERC's refusal to hold a hearing to determine whether VELCO initiated the filings only after reaching good faith disagreement contravened statutory, regulatory and case law guidelines. While Vermont's challenge is largely devoted to its first argument, we will consider each of the contentions in turn.

## A

◼ VDPS maintains that FERC's interpretation of the Vermont–VELCO 1957

contract cannot be squared with either the language or structure of the agreement. To make matters worse, Vermont complains, the Commission's interpretation leads to absurd results. Contrary to FERC's determination, VDPS insists that the supervisory powers reserved by Vermont in the 1957 contract did not expire on June 30, 1985, when the original term of the St. Lawrence Contract S–2 ended. Instead, VDPS maintains, those powers survive Contract S–2 and attach to VELCO's transmission of Vermont's 1985 NYPA purchase. In VDPS's view, *Mobile-Sierra* therefore precludes VELCO's unilateral filings, which fail to recognize the State's continuing supervisory powers. *See supra* note 15. In short, VDPS's *Mobile-Sierra* argument relies on the principle that a utility can make only such unilateral filings as are consistent with the terms of the contract governing relationships between the utility and its customers. *See Cities of Bethany v. FERC,* 727 F.2d 1131, 1143–44 (D.C.Cir.), *cert. denied,* 469 U.S. 917, 105 S.Ct. 293, 83 L.Ed.2d 229 (1984).

We pause at the outset to observe that VDPS faces a high hurdle in assailing FERC's interpretation of the 1957 contract. It is the settled law of this circuit that substantial deference is accorded to the Commission's interpretation of utility contracts; we ask only whether that interpretation is "amply supported both factually and legally." *Kansas Cities v. FERC,* 723 F.2d 82, 87 (D.C.Cir.1983) (quoting *Gulf States Utilities Co. v. FPC,* 518 F.2d 450, 457 (D.C.Cir.1975) (quoting *United Gas Pipeline Co. v. Memphis Light, Gas & Water Division,* 358 U.S. 103, 114, 79 S.Ct. 194, 200, 3 L.Ed.2d 153 (1958)). Indeed, only recently we held that this deferential standard applied to FERC's determination that *Mobile-Sierra* did not bar a utility's unilateral rate filing. *Holyoke Water Power Co. v. FERC,* 799 F.2d 755 (D.C.Cir. 1986); *see also United Gas Pipe Line,* 358 U.S. at 114, 79 S.Ct. at 200. In a still more

---

**16.** Indeed, Congress has generally limited judicial review of the Commission's orders to those objections urged before the Commission in the application for rehearing. 16 U.S.C. § 825*l*(b);

*see also Wisconsin v. FPC,* 373 U.S. 294, 307, 83 S.Ct. 1266, 1273, 10 L.Ed.2d 357 (1963); *ASARCO, Inc. v. FERC,* 777 F.2d 764, 773–75 (D.C.Cir. 1985).

recent opinion, we discussed at length the bases of this doctrine of deference. *National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1568–72 (D.C.Cir.1987). Our unwillingness to displace the Commission's reasonable interpretation of a contract with one more to our liking is dictated in part by recognition that the Article I branch has seen fit to vest FERC with broad discretion to oversee energy rate regulation. *See Southern California Edison,* 805 F.2d at 1071–72. As the Supreme Court made clear in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), this explicit delegation of authority to ensure reasonable rates through adjudication, *see, e.g.,* 16 U.S.C. § 824e(a) (1982), "compels a court to give deference to the agency's conclusions even on 'pure' questions of law within that domain ... [and] implicitly modifie[s] ... the traditional rule of withholding deference on questions of contract interpretation." *National Fuel,* at 1569–70 (citing *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–83). Common sense also dictates deference to FERC's interpretation of utility contracts. "[W]e would be foolish not to accord great weight to the judgment of the expert agency that deals with agreements of this sort on a daily basis." *Kansas Cities,* 723 F.2d at 87. Indeed, "the congressional grant of authority to the agency indicates that the agency's interpretation typically *will* be enhanced by technical knowledge." *National Fuel* at 1570 (emphasis in original). When we assess petitioner's challenge to FERC's reading of the 1957 contract in light of this sound principle of judicial restraint, we conclude that FERC's analysis should survive Vermont's onslaught.

While staunchly asserting that the language of the contract was crystal clear, VDPS in fact argues that one may read the contract in at least three different ways. Each of VDPS's proffered readings nonetheless supports its ultimate position that the supervisory powers attach to Vermont's 1985 NYPA purchase. First, VDPS contends that for purposes of the 1957 contract this post–S–2 power qualifies as power purchased under Contract S–2, to which, as both parties and the Commission agree, the supervisory powers append. Second, VDPS asserts that regardless whether this new power is S–2 power, its 1985 purchase constitutes "St. Lawrence power" within the meaning of the 1957 contract because it comes, in part, from the St. Lawrence project. Third, VDPS maintains that the supervisory powers govern any purchase of power Vermont makes, whether it falls within the categories of "St. Lawrence power" or "other power" created by the 1957 contract. We believe, upon analysis, that the Commission reasonably parsed the language of the 1957 contract to reject each of Vermont's arguments.

The Commission's determination that the 1985 NYPA purchase did not constitute Contract S–2 power was straightforward and cogent. Contract S–2 by its terms was to expire June 30, 1985, unless the parties agreed to a renewal. *See Vermont Electric Power Co.,* 33 F.E.R.C. ¶ 61,287, at 61,578 n. 4; *see also* St. Lawrence Contract S–2 art. VII(a), at 7, R. at 170–A. The documents related to Vermont's 1985 NYPA purchase state that it was being made pursuant to a *new* tariff promulgated by NYPA. They make no reference whatever to Contract S–2. *Id.* 33 F.E.R.C. ¶ 61,287.[17] Indeed, VDPS has candidly conceded that the 1985 purchase is not "within the four corners" of Contract S–2. *Id.*

---

**17.** Documents from both VDPS and NYPA indicate that the 1985 purchase was but one of many interim agreements between NYPA and neighboring States. Those agreements were occasioned by NYPA's new tariff, and based, not on preexisting contracts, but instead on a condition in the 1953 license granted by the Federal Power Commission (FERC's predecessor) to PASNY (NYPA's predecessor) to operate the St. Lawrence project. Under this condition, NYPA is obligated to make St. Lawrence power "available on an equitable basis to consumers in the United States, outside the State of New York, but within economic transmission distances of the project," *Power Authority of the State of New York,* 12 F.P.C. 172, 184, 185 (1953). *See* Letter from VDPS to PSC (June 28, 1985), R. at 289–90; NYPA Press Release, at 1 (June 25, 1985), R. at 291. Vermont is the neighboring State within the closest economic distance of the St. Lawrence project. Petitioner's Brief at 22 n. 6.

Since VDPS has advanced not a shred of evidence to support its characterization of the 1985 NYPA purchase as an extension of S-2, FERC's conclusion that the purchase was not S-2 power was, if not inescapable, entirely reasonable.

Having concluded, sensibly we believe, that the 1985 purchase was not "S-2 power," FERC also determined that it did not qualify as "St. Lawrence power" within the meaning of the 1957 contract, to which, all are agreed, the supervisory powers attach. In reaching this pivotal conclusion, the Commission relied on section 0.2 of the 1957 contract, *see supra*, which defines "St. Lawrence power" as that furnished pursuant to Contract S-2. *See* 32 F.E.R.C. ¶ 61,445, at 62,024–25. VDPS's argument that "St. Lawrence power" is any power that comes from the St. Lawrence project is based on section 2.2, specifically the portion that refers to power from "sources ... other than those enumerated in St. Lawrence Contract S-2." This, VDPS maintains, proves that "St. Lawrence power" is defined in terms of its source, not in terms of Contract S-2. As the Commission pointed out, however, 33 F.E.R.C. ¶ 61,287, at 61,577, VDPS ignores the fact that section 0.2, *supra*, supplies a definition of "St. Lawrence power." It is all classes of power furnished under Contract S-2. The 1957 contract then distinguishes VELCO's service obligations in sections 2.1 and 2.2 to deliver, respectively, "St. Lawrence power" and "other power." The Commission finally noted that VELCO's interpretation of "St. Lawrence power" (as that which has as its source the St. Lawrence project) conflicted with the use of the plural, "sources," in section 2.2 itself. *Id.* This analysis is, in our view, reasonable; in fact, we find the textual support favoring the Commission's interpretation of "St. Lawrence power" and weighing against VDPS's overwhelming. Vermont's 1985 NYPA purchase is undoubtedly the purchase of "other power."

Thus, VDPS's petition can succeed only if we accept the third of its readings of the 1957 contract—that supervisory powers apply to the transmission of "other power" as well as "St. Lawrence power"—*and* if we conclude that the Commission's conclusion to the contrary is implausible. In its analysis, the Commission relied primarily on section 2.2, which provides, as we have seen, that transmission of "other power" may be transmitted "upon such terms and conditions as the parties hereto shall determine." Renewal in 1969 of the 1957 contract, the Commission found, carried forward this provision, in effect extending VELCO's duty to transmit "other power" while leaving to the parties' agreement the terms and conditions of transmission, including the existence and extent of Vermont's supervisory powers. Considering only the language of sections 0.2, 2.2 and 10.3 (the last being the renewal provision), the Commission's reading appears to us unassailable.

VDPS complains, however, that FERC overlooked the fact that the supervisory powers contained in the 1957 contract relate generally to the operation of the transmission facilities, not solely to transmission of Contract S-2 power. As evidence that FERC misunderstood the reach of the contractually created supervisory powers, VDPS refers us to the Commission's statement that "[t]he extent of Vermont's supervisory powers set forth in Article I of [the 1957] contract are clearly tied to VELCO's obligation to transmit power sold in accordance with Contract S-2, as stated in section 1.1," 33 F.E.R.C. ¶ 61,287, at 61,576. This, Vermont charges, is impermissibly myopic. Vermont's supervisory powers, VDPS emphasizes, are found not only in Article I of the contract but in Article II as well.[18] Moreover, one of those Article II supervisory powers is found in section 2.5, a provision which is specifically referenced in section 2.2. FERC's failure to account for the Article II supervisory powers, VDPS concludes, illustrates the Commission's misapprehension of the structure of the contract.

**18.** Petitioner's Brief at 26 & n. 10; Reply Brief at 11. Petitioner also led off its oral argument with this point.

When we examine the quoted statement and the discussion in which it occurs, however, we are constrained to conclude that it is VDPS, not the Commission, which has succumbed to error in reading the contract. As is clear even from FERC's statement quoted above, the Commission was not saying, as VDPS would have us believe, that Vermont's supervisory powers are *only* contained in Article I of the contract. Rather, the Commission was there stating, one would more naturally think, its finding that those supervisory powers *which are contained in Article I* are linked to VELCO's Contract S–2 obligations.[19]

Moreover, when we look to FERC's discussion as a whole, we find the following pertinent observation:

> The conclusion that VELCO's obligation to transmit power under the rates, terms, and conditions of the 1957 contract is limited to power sold pursuant to Contract S–2 is supported by other provisions [besides 0.2] of the former agreement. Sections 1.1 and 2.3, which prescribe the construction and operation of VELCO's transmission system, specifically reference Contract S–2.

33 F.E.R.C. ¶ 61,287, at 61,576 (emphasis added). This passage suggests that the Commission indeed considered the supervisory powers in Article II as well as those in Article I. Section 1.1, referenced in the passage alongside section 2.3, obligates VELCO to construct a "transmission system and associated facilities" adequate to deliver power "purchased . . . in accordance with the St. Lawrence Contract S–2." Section 1.1 also makes clear that this obligation applies not only to the facilities VELCO initially constructs, but also "include[s] any addition or extension which subsequently may be made as herein provided." Both initial facilities and subsequent facilities, under section 1.1, "shall be designed and constructed in accordance with such standards . . . as the State shall

require." Sections 1.3 and 1.4 then elaborate the State's power under section 1.1 to maintain standards for construction and operation of the facilities to carry Contract S–2 power. Section 1.3 provides for state approval of the *initial* "transmission system and associated facilities" described in section 1.1, whereas section 1.4 provides for state approval of those "provided *subsequent* to the initial facilities." Thus, as the Commission's reference to section 1.1 indicates, the supervisory powers set forth in sections 1.3 and 1.4 originate in section 1.1, which specifically references Contract S–2.

But we must not forget about Article II. As the Commission's citation of section 2.3 alongside section 1.1 suggests, *Article II is constructed identically to Article I and ties the supervisory powers to Contract S–2.* Section 2.3 defines VELCO's general obligation to *operate* the facilities, just as section 1.1 defines its general obligation to *construct* those facilities. Critically, like section 1.1, section 2.3 does so by reference to Contract S–2. It requires VELCO to

> operate and maintain its electric transmission system and its interconnected electric facilities . . . in such manner as to assure as high degree as is economically practicable of dependability and quality of service in the delivery of *St. Lawrence power . . . and in accordance with the provisions of St. Lawrence Contract S–2.*

1957 Contract ¶ 22, at 6, R. at 127 (emphasis added). Sections 2.4 and 2.5 then elaborate this general service obligation, just as sections 1.3 and 1.4 elaborated VELCO's general construction obligation contained in section 1.1. Section 2.4 provides for transmission by subcontractors "where economy in cost of transmission or increased dependability of service" will be thereby achieved and the State approves. Section 2.5 similarly provides for use of facilities by others "where economy in cost . . . or in-

---

**19.** The phrase "set forth in Article I of [the 1957] contract" functions as an essential (or "defining") participial phrase in the statement quoted in the text; it defines *which* supervisory powers FERC means. To support VDPS's allegation that FERC overlooked the supervisory powers

in Article II, the phrase would have to function as a non-essential (or "non-defining") predicate phrase—FERC's statement, for example, would have to be "the extent of Vermont's supervisory powers, *which are* set forth in Article I of [the 1957] contract, . . ."

creased dependability" warrants it and the State concurs.

In sum, it is grasping at straws to fault the Commission for misapprehending the structure of the contract and failing specifically to discuss section 2.5, referred to in the "other powers" provision of section 2.2. Our examination of sections 1.1 and 2.3 convinces us that FERC correctly relied on them for its conclusion that the supervisory powers contained in the sections following them were "linked to the now-terminated S-2 Contract," 33 F.E.R.C. ¶ 61,287, at 61,-577. Indeed, we believe that VDPS's curious omission of any discussion of sections 1.1 and 2.3 betrays a misunderstanding of both the structure of the contract and the nature of Vermont's supervisory powers.

VDPS has one final arrow in its quiver. It argues that the Commission's interpretation—that the supervisory powers do not attach to transmission of Vermont's 1985 NYPA purchase—leads to absurd results. It attempts to support this argument with two specific examples. First, it asserts that, under the Commission's interpretation, even during the period Contract S-2 remained in effect VELCO could have made a unilateral filing as to transmission of "other power" that omitted reference to Vermont's supervisory powers, while presumably leaving these powers intact as to St. Lawrence power. This, VDPS claims, is an absurd result, since both "other power" and St. Lawrence power have always been carried over the same facilities; hence, the argument runs, VELCO could not on the basis of unilateral filings refuse to recognize supervisory power over facilities that carried Contract S-2 power. In a related contention, Vermont argues that, under the Commission's interpretation, VELCO could now refuse to carry "other power" on the grounds that capacity to carry it has been allotted to other customers. Petitioner's Brief at 28 & n. 13; Reply Brief at 8–9.

VDPS's first example proceeds from a mistaken premise. The Commission only decided in this case that "the continuation

of the supervisory powers earlier agreed to by the parties was linked to the now-terminated S-2 Contract." 33 F.E.R.C. ¶ 61,287, at 61,577. The Commission did not address the question whether *during the term of Contract S-2* VELCO could have prevented VDPS from exercising supervisory authority over transmission of St. Lawrence power by unilaterally filing a rate schedule for transmission of other power that omitted this authority. Thus, for example, while S-2 was in effect (and Vermont, under the Commission's interpretation, retained its supervisory powers), it may not have been open to VELCO to refuse to seek Vermont's approval to construct additional facilities just because these facilities would carry "other power" as well as St. Lawrence S-2 power. At any rate, the Commission did not resolve this hypothetical situation, nor does its holding suggest how it would have done so.

Likewise, the second "absurd result" proffered by VDPS does not follow ineluctably from the Commission's orders in this case. FERC expressly concluded that the renewed 1957 contract obligates VELCO to deliver Vermont's purchases of "other power" through the year 2000. 33 F.E.R.C. ¶ 61,287, at 61,576. Furthermore, it explicitly designated the 1957 contract as a supplement to VELCO's 1985 filings. 32 F.E.R.C. ¶ 61,445, at 62,025. In addition to this contractual protection afforded Vermont, any agreement that VELCO reaches with Vermont and any filing by VELCO for transmission of "other power" are subject to scrutiny by the Commission to ensure that they prescribe just, reasonable, and nondiscriminatory rates. *See* 16 U.S.C. §§ 824d, 824e. Thus, VELCO is not in a position to freeze out Vermont, as VDPS's example suggests. Beyond enjoying the significant protections just mentioned, Vermont must now go to the table and negotiate with VELCO about the terms and conditions under which VELCO transmits its power. This is hardly "absurd," especially in view of the fact that Vermont is now only one of many users of VELCO's facilities.[20]

---

20. *See* June 28 filing, *supra* note 8, at 2, R. at 2. As we observed previously, Vermont now ac-

counts for about 20% of VELCO's revenues.

Again, we have not the slightest intention of foreordaining the outcome of future disputes between VELCO and Vermont. And since the Commission did not rely in its decision on Vermont's present status as one of many users of the facilities, we by no means suggest this as a basis for upholding the Commission's orders. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459–60, 87 L.Ed. 626 (1943); *Southern California Edison*, 805 F.2d at 1072 n. 5. To the contrary, our discussion responds solely to Vermont's jeremiad of "absurd results." Vermont's invocation of absurdity, in our view, does not necessarily reflect any "result" of FERC's decisions.

Indeed, we believe that VDPS's reading of the 1957 contract, though not absurd, is certainly less natural than the interpretation embraced by the Commission. In view of the importance VDPS maintains Vermont has always attached to its supervisory powers, it is difficult to understand why the State would have permitted section 2.2 to be drafted so as, on its face, to leave open *all* terms and conditions for transmission of "other power." Moreover, if in the face of the language of section 2.2, VDPS's reading prevails, it imposes on VELCO a potentially limitless obligation: to construct and maintain facilities under State supervision for any purchase of "other power" Vermont may choose to make. Perhaps it was precisely the contemplation of such openended subjugation to the heavy hand of state supervision that led VELCO to have section 2.2 drafted as it was, to limit state supervisory powers to transmission of power provided for a limited term under a specific agreement, namely Contract S–2.

In sum, we are convinced that FERC amply justified its determination that VELCO's unilateral filings of June, July, and August 1985 did not violate *Mobile-Sierra*, but were, instead, consistent with the 1957 transmission contract, and therefore permissible. *See Cities of Bethany*, 727 F.2d 1131. Having reached this critical conclu-

sion, we need not tarry long over VDPS's remaining challenges.

**B**

■ VDPS argues that the Commission improperly granted waivers of the 60–day notice requirement, set forth in 16 U.S.C. § 824d(d), with respect to VELCO's June 28 and August 7 filings. VDPS specifically alleges that these waivers are defective in three respects: (1) they violate the Federal Power Act, *id.*, which requires "good cause" to support a waiver; (2) they mark a departure from the Commission's own regulation, 18 C.F.R. § 35.11 (1986), which requires, among other things, evaluation of the adverse impact of a waiver on the utility's customer; (3) by permitting VELCO to invoke the cancellation provision in its June 28 filing before that filing was accepted for filing (in the Commission's September 1985 order), the waivers contravened the prohibition on retroactive ratemaking and the "filed rate" doctrine.

We believe it unnecessary to analyze each of VDPS's various assertions, for it has entirely failed to demonstrate how granting the waivers of notice adversely affected it or how a judicial remedy would now help.[21] Indeed, the Commission cited as one reason for permitting the waivers the fact that VELCO's filings did not raise rates or otherwise adversely affect Vermont. Thus, for example, the waivers did not enable VELCO to charge Vermont more than it could had the filings taken effect after 60 days. *Cf. Louisiana Power & Light Co.*, 16 F.E.R.C. ¶ 61,019, at 61,031, 61,033 (1981). Nor, assuming *arguendo* that Vermont's supervisory powers survived the termination of Contract S–2, has VDPS described any instance in which the waiver prevented it from exercising those powers. Under these circumstances, reviewing the Commission's grant of waivers of notice would amount to needless second-guessing of the Commission's exercise of discretion. We decline the invitation, which frankly should never have been ex-

---

**21.** Indeed, VDPS conceded at oral argument that the waivers of notice, standing alone, caused it no harm.

tended to us in the first instance. *See supra* note 21.

### C

■ We find similarly without merit petitioner's final argument, namely that FERC improperly denied its request for a hearing before accepting VELCO's filings. A hearing was necessary, VDPS maintains, to determine whether VELCO and VDPS reached an impasse in negotiations for transmission of Vermont's 1985 NYPA purchase, or, instead, whether bad faith underlay VELCO's refusal to reach an agreement. The Commission determined that no hearing was needed because VELCO's filings and VDPS's objections to them presented only a question of contract interpretation; they raised no genuine issue of material fact. 32 F.E.R.C. ¶ 61,445, at 62,-025; 33 F.E.R.C. ¶ 61,287, at 61,577–78.

The Commission correctly recognized that case law and the Commission's own regulations require an evidentiary hearing only when a genuine issue of material fact exists. *Ohio Power Co. v. FERC*, 744 F.2d 162, 170 (D.C.Cir.1984) (citing *Public Service Co. of New Hampshire v. FERC*, 600 F.2d 944, 955 (D.C.Cir.), *cert. denied*, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979) and *Citizens for Allegan County, Inc. v. FPC*, 414 F.2d 1125, 1128 (D.C.Cir. 1969)); 18 C.F.R. § 385.217(b) (1986). Without evidence of an abuse of discretion, we defer to an agency's determination that a controversy raises no such issues. *See Ohio Power*, 744 F.2d at 170. In this case, VDPS has suggested nothing that convincingly impugns VELCO's attempts to reach agreement with VDPS.[22] We therefore conclude that FERC acted within its discretion in denying VDPS's request for a hearing.

### III

To recap, we hold that FERC's interpretation of the 1957 transmission contract was amply supported both legally and factually. In addition, we conclude that review of the Commission's grant of waivers of notice requirements with respect to VELCO's filings is unwarranted since petitioner has failed to show how it was adversely affected by those waivers. Finally, we conclude that FERC acted reasonably in refusing to hold a hearing before issuing the challenged decisions. The petition for review is therefore

*Denied.*

**22.** VDPS cited as evidence of VELCO's bad faith: (1) its belated filing of a schedule for transmission of Ontario Hydro power, Petitioner's Brief at 32–34; and (2) its abruptly terminating negotiations on an agreement for transmission of Vermont's 1985 NYPA purchase, *id.* at 35. As to the first, VELCO explained that it believed that Vermont would no longer be receiving Canadian power. *See* June 28 filing, *supra* note 8, at 3, R. at 3, and that it never expressed unwillingness to transmit that power, VELCO's Answer to Motion to Reject or Alternatively to Suspend and Set Hearing, FERC Docket No. ER 85–595, at 16–17, R. at 113–14. The August filing, which committed VELCO to carrying this power, appears to confirm VELCO's explanation. As for the second example VDPS proffers, it appears to amount to an assertion that the parties' failure to reach agreement, standing alone, demonstrates bad faith. As such, this remarkable assertion raises no "genuine issue of material fact."