ALABAMA POWER COMPANY; Georgia
Power Company; Gulf Power Company;
Mississippi Power Company; Savannah
Electric and Power Company; Southern
Company Services, Inc., Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Alabama Public Service Commission; City
of Tallahassee, Florida; Oglethorpe
Power Corporation, Intervenors.

ALABAMA POWER COMPANY; Georgia
Power Company; Gulf Power Company;
Mississippi Power Company; Savannah
Electric and Power Company; Southern
Company Services, Inc., Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Alabama Public Service Commission;
Cajun Electric Power Cooperative,
Inc., Intervenors.

Nos. 91–1595, 91–1654.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 12, 1993.

Decided May 28, 1993.

Rodney O. Mundy, with whom Dan H. McCrary, Mark A. Crosswhite, Birmingham, AL Robert H. Forry, Atlanta, GA, Leamon R. Holliday, III, Savannah, GA, G. Edison Holland, Jr., Pensacola, FL, and Ben H. Stone, Gulfport, MS, were on the joint brief, for petitioners in Nos. 91–1595 and 91–1654.

Samuel Soopper, Atty., with whom William S. Scherman, Gen. Counsel, Jerome M. Feit, Sol., and Joseph S. Davies, Deputy Sol., F.E.R.C., Washington, DC, were on the brief, for respondent.

John N. Estes, III, Washington, DC, entered an appearance for intervenor Oglethorpe Power Corp.

P. Michael Cole, Athens, AL, entered an appearance for intervenor Alabama Public Service Com'n.

Gary D. Bachman, Washington, DC, entered an appearance for intervenor City of Tallahassee, FL.

James D. Pembroke, Washington, DC, entered an appearance for intervenor Cajun Elec. Power Co-op., Inc.

Before WALD, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The first issue in this appeal is whether the Federal Energy Regulatory Commission ("FERC" or "Commission") may require different operating companies commonly owned by a holding company to charge a single system transmission rate on off-system sales of electricity transmitted throughout the lines of the various operating companies. The Southern Company ("Southern") owns petitioners Alabama Power Company, Georgia Power Company, Gulf Power Company,

Mississippi Power Company, and Savannah Electric and Power Company (the "operating companies" or "Southern Companies"), as well as petitioner Southern Company Services, Inc. ("SCSI"), a subsidiary service arm of Southern. The petitioners entered into a pair of contracts which obligated the Southern system to provide power, but charged cumulative rates for all individual operating companies whose lines were involved in the transmission. Based upon substantial evidence in the record, the Commission reasonably concluded that where an off-system sale binds an entire system of commonly owned operating companies, a single system transmission rate reflecting an average system-wide transmission cost is just and reasonable.

The second issue raised by the petitioners is whether the Commission was authorized to order an investigation under § 206 of the Federal Power Act ("FPA" or "Act") of all the petitioners' contracts employing formula rates with a return on common equity component of 13.75% or higher. Petitioners argue that the § 206 investigation violated a prior Commission-approved settlement which purportedly limited the right of Commission staff to request any inquiry into Southern's rate filings to specified time periods, so long as they complied with an agreed-upon formula. On appeal, FERC argues first that the investigation order is not appealable because hearings on the lawfulness of the rate of return are still ongoing, and second that even if petitioners' challenge is properly before this court, the prior settlement review procedures are inapplicable to Commission-initiated § 206 investigations. We conclude that the Commission's investigation order was a final, appealable agency action because, if the petitioners are correct, the order violated a valuable contractual right, negotiated between petitioners and the Commission to be free from formula rate investigations except at specified intervals. However, we do not read the settlement review procedures as circumscribing the Commission's authority to initiate a § 206 investigation. Accordingly, we deny the petition for review in both respects.

## I. BACKGROUND

On December 7, 1990, the five Southern operating companies and SCSI filed with FERC, pursuant to § 205 of the FPA, 16 U.S.C. § 824d, a unit power sales agreement with the City of Tallahassee, Florida. According to the filing, the "sales under the . . . agreement will be made out of Units 2, 3 and 4 of the Miller Plant (owned by Alabama Power) and out of Unit 3 of the Scherer Plant (jointly owned by Georgia Power and Gulf Power)." The accord specifically provided that the formula rates would include a transmission component reflecting the cumulative costs of delivering the energy through the internal transmission systems of the designated operating companies. Thus, for energy from the Miller Plant in Alabama, which would travel through the systems of both the Alabama Power Company and the Georgia Power Company, Tallahassee would be charged a cumulative transmission rate equal to the sum of individual transmission costs of the two power companies. For power generated at the Scherer Plant in Georgia, which would involve the use of only Georgia Power Company's transmission system, a transmission rate reflecting that single company's costs would be charged. The agreement also provided, however, that the energy supplied Tallahassee could if necessary come from the plants of any of the five operating companies. As explained in the filing, the Tallahassee agreement

> provides for the sale of: (i) "supplemental energy" when the [Miller and Scherer] units are derated or unavailable for service; (ii) "alternate energy" when the units are available for service but are not committed to operation because of economic priorities; and (iii) "replacement energy" at incremental cost when such energy is available on the electric systems of Southern Companies.

The formula rates also included a 13.75% return on common equity for petitioners.

On May 2, 1991, the Commission rejected the transmission rate methodology in the Tallahassee agreement for failing to meet the "just and reasonable" criterion set out in § 205 of the FPA, 16 U.S.C. § 824d(a), and directed the petitioners to file instead a single system transmission rate reflecting the average transmission costs of the entire

Southern system. *Southern Company Services, Inc.*, 55 F.E.R.C. ¶ 61,173 (1991). The Commission reasoned that because the petitioners had contracted with Tallahassee as a single, consolidated and jointly-owned system, the transmission rate should be based upon system-wide costs. Additionally, the Commission initiated on its own an investigation under § 206 of the FPA, 16 U.S.C. § 824e, of all petitioners' contracts containing formula rates with a return on common equity of 13.75% or higher, including the formula rate in the Tallahassee agreement. *Id.* Petitioners' request for rehearing was denied. *Southern Company Services, Inc.*, 57 F.E.R.C. ¶ 61,093 (1991).

On August 5, 1991, the petitioners filed with the Commission an interchange contract with Cajun Electric Power Cooperative, Inc. ("Cajun") which involved similar cumulative transmission charges based upon the amount of power flowing over each of the operating companies' internal transmission systems. The formula rates in the Cajun agreement contained a return on common equity of 14%. On October 4, 1991, the Cajun transmission rate methodology was rejected by FERC and the petitioners were directed to file a single system transmission rate. *Southern Company Services, Inc.*, 57 F.E.R.C. ¶ 61,035 (1991). The proposed 14% return on common equity was included in the § 206 investigation of the Tallahassee formula rate. The Commission predictably denied rehearing. *Southern Company Services, Inc.*, 57 F.E.R.C. ¶ 61,284 (1991).

An administrative law judge ("ALJ") subsequently conducted a hearing on the 13.75% (and higher) formula rates in petitioners' contracts, and concluded that the rates should not be modified. *Southern Company Services, Inc.*, 60 F.E.R.C. ¶ 63,013 (1992). An appeal from that decision is currently pending before the Commission.

## II. ANALYSIS

### A. Single System Transmission Rate Requirement

 The Commission "must be free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests." *Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968). So long as its decision is reached by reasoned decisionmaking and supported by substantial evidence, we are obliged to defer to its technical ratemaking expertise. *See Norwood v. FERC*, 962 F.2d 20, 22 (D.C.Cir.1992); *Union Electric Co. v. FERC*, 890 F.2d 1193, 1199 (D.C.Cir.1989); *Pub. Serv. Comm'n v. FERC*, 813 F.2d 448, 451 (D.C.Cir.1987). We also defer to FERC interpretations of settlement agreements that are supported factually and legally. *See Transcontinental Gas Pipe Line Corp. v. FERC*, 922 F.2d 865, 869 (D.C.Cir.1991); *Panhandle Eastern Pipe Line Co. v. FERC*, 881 F.2d 1101, 1118 (D.C.Cir.1989); *Duke Power Co. v. FERC*, 864 F.2d 823, 826 (D.C.Cir.1989); *Vermont Dep't of Pub. Serv. v. FERC*, 817 F.2d 127, 134–35 (D.C.Cir. 1987). Our deference on settlements stems from recognition of the explicit statutory delegation of authority over ratemaking to FERC, which includes situations in which ratemaking will depend on the agency's contract interpretation. *See Tarpon Transmission Co. v. FERC*, 860 F.2d 439, 441–42 (D.C.Cir.1988). The Commission's expertise is reflected in all aspects of ratemaking, adversarial or interpretive. In this case, the Commission concluded that the Tallahassee and Cajun agreements called for the entire Southern system, as opposed to one or more of its individual operating companies, to provide the contracted for energy. Based upon that determination, the Commission reasoned that charging a transmission rate reflecting the average cost system-wide, would be more just and reasonable than permitting a cumulative rate based upon the transmission costs of each of the operating companies who would nominally supply energy to either Tallahassee or Cajun under the contracts.[1] The Commission's resolution is worthy of our deference because it is the product of reasoned decisionmaking and substantial evidence.

---

**1.** It may be useful to explain in hypothetical arithmetic terms, how use of the two different transmission rate methodologies produces different results under the Tallahassee agreement. Using a cumulative transmission rate, the "fully allocated" cost equals the percentage of Alabama

### 1. *The Tallahassee and Cajun Agreements*

■ At the outset we note that the operating companies comprising Southern are organized, both physically and as a matter of corporate ownership, into a single, consolidated system. Southern is a registered holding company under the Public Utility Holding Company Act of 1935 ("PUHCA"), 15 U.S.C. § 79 et seq., and, within the meaning of that statute, constitutes an "integrated public-utility system" which denotes a regional, physically interconnected system of generating plants, transmission lines and distributing facilities, whose utility assets are physically interconnected and capable of operation as a single interconnected and coordinated system, 15 U.S.C. § 79b(a)(29). *See* Petitioners' Reply Brief at 2. In the Cajun filing itself, petitioners specified that the "respective generating and transmission systems of Southern Companies are interconnected with each other, and constitute an integrated system operating in parts of the States of Alabama, Georgia, Florida and Mississippi." Similarly, the Commission observed that the individual companies comprising Southern operate in a coordinated manner through joint planning and a physically contiguous system. 57 F.E.R.C. at 61,-335–36 & n. 14. This cohesive organization of the Southern system carries the Commission some distance, but not the whole way, toward its conclusion that a single system transmission rate is obligatory in this case. For instance, no one disputes that an individual operating company, owned by a holding company, is entitled to charge its own native load customers a rate based solely upon its own transmission costs. Presumably, such an operating company could also apply an individualized transmission rate for an off-system sales contract, so long as the transaction involved only that company, and no other member of the integrated system. That caveat, however, does not apply to the case before us. The Commission on sufficient evidence here has concluded that both the Tallahassee and Cajun agreements essentially obligate the entire system to provide energy, as opposed to any single (or two) individual operating companies.

Turning first to the Tallahassee agreement, all five Southern Companies and SCSI are signatories. This fact is neither irrelevant nor inadvertent; although plants owned by Alabama Power and Georgia Power are expressly designated to provide energy to Tallahassee, numerous provisions throughout the contract make unmistakably clear that all six petitioners bound themselves as an entire consolidated system to meet Tallahassee's needs. Section 2.3 of the pact provides that "[i]t is recognized by the parties . . . that the actual units from which sales will be made . . . may vary." This variance can occur in three ways. First, whenever the designated Alabama Power and Georgia Power plants are unable to supply the required amount, sections 3.8.1 to 3.8.3 commit Southern Companies to "use their best efforts . . . to make available supplemental energy from other coal-fired or comparably-priced generating resources available to Southern Companies," and if that proves impossible, "to make energy available from higher-priced generating resources of Southern Companies." Second, section 3.9 requires that the operating companies ready replacement energy "from the lowest energy cost generating resources that can be made available." Third, and we think most critically from the seller's point of view, section 3.7 provides the Southern Companies with the "sole option" of providing alternate energy "from other resources owned or operated by Southern Companies" even when the designated Alabama Power and Georgia Power plants are available. Petitioners admit this powerful option may be exercised whenever "economic priorities" make it attractive to do so. Finally, the contract emphasizes that supplemental, replacement and alternate energy "will be supplied from the

Power's transmissions represented by the Tallahassee transaction (10%) times the utility's total transmission costs ($500) plus the percentage of Georgia Power's transmissions represented by the Tallahassee agreement (5%) times that utility's total transmission costs ($1000). The result under this hypothetical would be a charge of $100 [(.10 × $500) + (.05 × $1000)]. Under a single system transmission rate, the cost would equal the percentage of the entire Southern system's transmissions represented by the Tallahassee agreement (1%) multiplied by the system's total transmission costs ($5000) for a total of $50.

units ... on the systems of Southern Companies." Based on the foregoing contract provisions, the Commission determined that the Southern Companies "have in this instance integrated their resources to provide service to Tallahassee." 57 F.E.R.C. at 61,336.

The operating companies, on the other hand, characterize these provisions as merely "ancillary features" of a core agreement of the individual companies to transmit discrete amounts of energy over their lines. We do not agree. The terms of a power sales agreement which identify the sources of that power have to be fundamental. The alternate energy provision, permitting use of the full circle of Southern company plants, provides petitioners the flexibility to satisfy their contractual obligation in the most efficient way possible. For Tallahassee, the supplemental and replacement energy clauses guarantee that the city will have access to the energy from five power companies rather than two. Indeed, one of the principal reasons identified by the parties for entering into this particular compact was to provide "necessary transmission services and supplemental energy when any designated unit of the Miller Plant or Scherer Plant is unavailable or derated." The petitioners admit that "Tallahassee did not want to purchase exclusively out of a single unit or even a single plant due to concerns as to the reliability of its power supply should there be an outage at that unit." Petitioners' Brief at 29. In sum, it seems quite plain to us that the Commission captured the essence of the contract in its finding that "by its express terms, [the agreement] is not with just Georgia Power and Alabama Power but with SCSI and the five affiliated operating companies of the Southern Companies system." 57 F.E.R.C. at 61,336 n. 17.[2]

The Cajun agreement makes the point even more neatly. Not only are all five operating companies and SCSI again parties to the contract, but the arrangement explicitly governs "electric services to be supplied by Cajun to Southern Companies and by Southern Companies to Cajun." Every contract obligation and responsibility is expressly made between the entire Southern system and Cajun. For instance, section 5.3 provides that "Cajun and Southern Companies will protect, operate and maintain their respective systems so as to avoid or minimize the likelihood of disturbances which might cause impairment of, or jeopardy to service in, the other's system." Section 5.8 states that "[s]ince the systems of Cajun and Southern Companies are directly interconnected with other electric systems, it is recognized that the physical and electrical characteristics of the facilities involved may result in flows of power from Cajun to Southern Companies, or vice versa, through other electric systems." Finally, the parties agree to reserve for each other "short term power," defined as "surplus capacity and energy existing from time to time on the system of one party, not needed at that time on its system to meet its system load requirements and other power sale commitments." In sum, nowhere in the agreement is there the remotest indication that any of the several operating companies has the sole responsibility of providing service. Under such circumstances, we have no difficulty in finding that the Commission reasonably concluded that "sales to Cajun under the Interchange Contract are sales by the Southern Companies system rather than sales by the individual operating companies." 57 F.E.R.C. at 61,124.

### 2. Transmission Rates

Under the Tallahassee agreement, the petitioners proposed to charge Tallahassee a cumulative transmission rate based on the costs of dispatching the energy from Alabama Power and Georgia Power to Tallahassee. The Commission explained, "the transmission component applicable to the Miller

---

**2.** The Commission explained

that simply because the proposed agreement identified Miller Unit Nos. 2, 3, and 4 and Scherer Unit No. 3 does not mean that even if these units are running the electricity provided to Tallahassee will actually come from these

units, or that it will flow over the identified interconnections. The nature of electricity is such that what Tallahassee ultimately receives may well come from some other plant and may well flow over some different transmission path.

57 F.E.R.C. at 61,336–37 n. 18.

units consists of cumulative charges reflecting the sum of the rates for two of the operating companies (Georgia Power and Alabama Power)." 55 F.E.R.C. at 61,555. The Commission demurred, reasoning that petitioners should be required to file a single transmission charge reflecting the costs of the consolidated Southern system. The Commission observed that petitioners had in the past filed formula rates incorporating a single system transmission rate methodology that if applied here would result in transmission charges approximately one-half of what Southern was charging to Tallahassee. *Id.;* 57 F.E.R.C. at 61,334 n. 5. Similarly, the Commission explained that under the Cajun agreement,

> the charge for short-term power ... includes a form of cumulative transmission pricing rather than the type of transmission pricing based on system-wide costs that is contained in most of the existing Southern Companies formula rates. In this case, the rate for short-term power develops a transmission charge for each affiliated operating company and assesses cumulative charges to the extent that more than one operating company is deemed to participate in the transaction.

57 F.E.R.C. at 61,124. Accordingly, FERC directed petitioners to file revised transmission rates based on system-wide costs.

Petitioners complain that the only "just and reasonable" transmission rate must be based upon the cumulative transmission costs of each individual operating company. For example, they argue that the Alabama Power Company and Georgia Power Company can recover their transmission costs under the Tallahassee agreement only by charging the fully allocated cost of delivering energy through each company's individual transmission system. However, because the agreement places obligations on all five operating companies, a transmission rate based upon the costs of just two of the companies cannot be said to be statutorily mandated under the "just and reasonable" formula. That is, the cumulative transmission rate sought by petitioners cannot be justified on a strict cost-basis: Tallahassee would be required to pay the individual transmission costs of the Alabama Power Company and the Georgia Power Company even if the energy came from the plants of other Southern Companies. *See Ohio Edison Co.,* 23 F.E.R.C. ¶ 61,344 at 61,749 (1983) (Commission's "obligation under Sections 205 and 206 ..: [is] to ensure that [rates] are just and reasonable, which, in general, means that they be cost-based"); *see also Alabama Electric Coop., Inc. v. FERC,* 684 F.2d 20, 27 (D.C.Cir.1982). We cannot very well fault the Commission's determination that where a contract requires a single, consolidated system of jointly-owned operating companies to provide energy, a cumulative transmission rate based upon the costs of individual operating companies from which the energy is expected to flow, usually but not always, is not just or reasonable within the meaning of the FPA, 16 U.S.C. § 824d(a).[3]

■ On balance, we find the Commission reasonably concluded that a single system transmission rate is just and reasonable on this record. Petitioners contended at oral argument that the single system rate will necessarily result in subsidization for the off-system customers, Tallahassee and Cajun, by the native load customers. For example, the

---

**3.** The Commission correctly observes that the Southern system is "integrated" within the meaning of the PUHCA, 15 U.S.C. § 79b(a)(29), in view of the interconnections between, and coordination among, the various operating companies. *See, e.g., New Orleans v. SEC,* 969 F.2d 1163, 1165 (D.C.Cir.1992); *Wisconsin's Environmental Decade, Inc. v. SEC,* 882 F.2d 523, 527 (D.C.Cir.1989). On that basis, the Commission argues that its order is supported by a longstanding FERC policy of "rolling in" the cost of transmission facilities in an integrated utility system, such that all customers share the costs of all facilities regardless of the particular facility that serves them. *See Holyoke Gas & Electric Dept. v.*

*FERC,* 954 F.2d 740, 741 (D.C.Cir.1992); *Central Maine Power Company,* 54 F.E.R.C. ¶ 61,206 at 61,613 (1991). However, the cases it cites use the term "integrated" to describe the transmission facilities of a *single* company. As one decision explains, a company's " '[l]ower voltage transmission facilities are "integrated," ... when, in addition to being connected with higher voltage facilities, the lower voltage facilities are themselves interconnected and designed to operate in parallel.'" *Sierra Pacific Power Co. v. FERC,* 793 F.2d 1086, 1088 (9th Cir.1986) (quoting Intervenor's Brief at 10). Thus, the Commission's argument on this narrow point does not carry the day.

Alabama Public Service Commission ("APSC") traditionally determines the Alabama Power Company's retail rates on the assumption that certain costs will be defrayed by off-system sales, and so if the Alabama Power Company cannot recover its full standard costs from off-system customers because of the single system transmission rate, the APSC will be forced to raise retail rates which will thereby subsidize the Tallahassee sale. On that score, the revised system-wide transmission rates mandated by the Commission have not yet been filed, so that we cannot ascertain at this point whether Tallahassee will receive a "free ride" at the expense of Alabama customers. At this point, the claims of subsidization are nothing more than speculation; the petitioners have offered no evidence that, once a single system transmission rate is set, the APSC will indeed be forced to modify upward retail rates for native load customers. Without some such tangible evidence, the Commission need not assume that a single system transmission rate methodology will result in unjust or unreasonable rates for native customers. Moreover, the premises under which the Alabama native load rates are set, while alluded to in the Commission's decision, were not addressed in petitioners' briefs or appendix and only emerged on appeal as the result of persistent questioning from this court at oral argument; it is consequently difficult for an appellate tribunal to adequately evaluate arguments so inadequately developed. *See NLRB v. Valley Bakery, Inc.,* 986 F.2d 339, 343 n. 4 (9th Cir.1993); *Ryan v. Royal Ins. Co.,* 916 F.2d 731, 734 (1st Cir.1990). However, even if we considered the issue to be properly raised here, we know of no doctrine that requires the Commission, in determining a just and reasonable rate for an off-system sale, to give dispositive weight to the fact that a state commission has assumed, for purposes of establishing native load rates, that the off-system rate would be higher. In other contexts, the Commission has not done so, and we see no reason why it should in this case. *Cf. Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986).

### 3. *Precedent*

Petitioners next assert that the Commission's ordering of a system-wide rate is inconsistent with judicial and agency precedent. Petitioners point to *Fort Pierce Utilities Authority v. FERC,* 730 F.2d 778 (D.C.Cir.1984), in which we rejected the argument of four municipal customers that their two utility sellers should be required to charge a single joint transmission rate for energy conveyed over the networks of both companies, rather than cumulative individual transmission rates. We found it critical whether the two separately-owned companies had "so fully integrated their transmission systems that they in fact function as a single unified network," *id.* at 781, and concluded that "the evidence was sufficient to support [FERC's] premise that the two transmission networks are not functionally merged," *id.* at 784. Noting the absence of any evidence in the instant case to "demonstrate that transfers of power between [the two sellers] take place on any other basis than as discrete arms-length transactions between distinct business entities," *id.* at 785, we found it unnecessary

> to determine whether there will ever be circumstances under which two utilities have gone beyond extensive cooperation and have so completely integrated the operation of their transmission systems that any transmission by either utility makes use of the combined network. In that case, a transaction crossing corporate boundaries, like the transmission of water across a single reservoir, would be functionally identical to a transaction within corporate boundaries. Such unusual circumstances would present a stronger case that individual rates permitted overrecovery of costs and that joint rates were therefore required.

*Id.* at 785.

We think our reasoning in *Fort Pierce* supports the Commission's position in this case. FERC is correct in observing that *Fort Pierce* "involved two independent, unaffiliated utilities while this case involves the affiliated utilities of a single integrated public utility system." 57 F.E.R.C. at 61,340. Further, substantial evidence supports the Com-

mission's view that in the case of the Talla-hassee and Cajun agreements, unlike in *Fort Pierce*, the Southern Companies are "func-tionally merged" for purposes of fulfilling their obligations under the unit power sales and interchange contracts. As a result, the Commission reasonably concluded that per-mitting the Southern Companies to charge cumulative individual rates would be artificial and that a single system rate is therefore required.

■ Second, the petitioners contend that the Commission's order deviates from estab-lished FERC precedent. They cite *Texas Utilities Electric Co.*, 49 F.E.R.C. ¶ 61,230 (1989), *rehearing denied*, 50 F.E.R.C. ¶ 61,-369 (1990), in which the Commission inter-preted a settlement agreement not to require a seller to bill the holding company rather than its affiliated operating companies for transmission costs. The Commission here pointed out that in *Texas Utilities*, the Com-mission found the agreement provided for sales to the affiliates as separate companies, whereas the present case involves sales by the consolidated Southern system as a whole. We agree that is a crucial distinction. Peti-tioners also identified several previous orders in which the Commission approved the use of cumulative transmission rates. In response, the Commission explained that "the overall charges . . . were reasonable when compared to charges developed using a single system transmission rate methodology," and there-fore no modification of the rates was neces-sary. 57 F.E.R.C. at 61,338. By contrast, the Commission found that in this case revi-sion of the transmission rates was required because "the overall charges here were not shown to be reasonable and instead may be unjust and unreasonable." *Id.*[4]

### 4. *Evidentiary Hearing*

■ Finally, the petitioners argue that even if the single system rate is theoretically

applicable to contracts made by subsidiaries of a holding company that obligate the entire system, the Commission erred in not holding an evidentiary hearing before deciding that a system-wide rate was appropriate in this par-ticular case. "Without evidence of an abuse of discretion, we defer to an agency's deter-mination that a controversy raises" no dis-puted issues. *Vermont Dep't of Pub. Serv.*, 817 F.2d at 140. And "even where there are such disputed issues, FERC need not con-duct . . . a hearing if they may be adequately resolved on the written record." *Moreau v. FERC*, 982 F.2d 556, 568 (D.C.Cir.1993). We do not find persuasive the two reasons cited as to why the Commission abused its discre-tion in failing to hold an evidentiary hearing.

First, petitioners contend that they pre-sented evidence from the negotiations of the Tallahassee agreement demonstrating that the Commission had wrongly concluded that the operating companies had negotiated with Tallahassee as an integrated whole. Howev-er, where the meaning of the agreement is clear on its face, as it is here, see pp. 1561–63 *supra*, an evidentiary hearing into extrinsic evidence of the parties' intent during negotia-tions is unnecessary. *See Ohio Power Co. v. FERC*, 744 F.2d 162, 169–70 (D.C.Cir.1984); *Papago Tribal Utility Authority v. FERC*, 723 F.2d 950, 955 (D.C.Cir.1983), *cert. de-nied*, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984). Second, the petitioners assert that while the Commission correctly found the Southern system to be integrated under the PUHCA, it improperly assumed that the system was "typical" of consolidated systems in that it "operate[s] jointly for the benefit of the affiliated utility system as a whole," 55 F.E.R.C. at 61,556. According to petitioners, the "uncontroverted evidence" shows that the Southern Companies "plan and build their transmission systems to serve their respective territorial load require-ments." Petitioners' Brief at 24. Even if true, the Commission tellingly responds that

---

4. As for the other orders cited by petitioners, the Commission correctly explained that the mere acceptance of agreements for filing does "not constitute a substantive determination that the rate methodology employed is just and reason-able." 57 F.E.R.C. at 61,338; *see* 18 C.F.R. § 35.4 (1991); *Southern Company Services, Inc.*, 46 F.E.R.C. ¶ 61,203 at 61,644 (1989); *Wisconsin*

*Power & Light Co.*, 31 F.E.R.C. ¶ 61,043 at 61,-075 (1985). Even if the Commission could be "estopped" by its previous orders approving cu-mulative transmission rates, the same could be said of the petitioners who, according to the Commission, in the past regularly filed agree-ments incorporating single system transmission rates. 57 F.E.R.C. at 61,334 n. 4.

the manner in which the system was planned or built does not detract from the fact that the Tallahassee and Cajun agreements at issue rely on the resources of the entire Southern system for compliance. The Commission properly resolved petitioners' concerns on the written record and acted within its discretion in refusing to hold an evidentiary hearing.

## B. Investigation of Formula Rates

In addition to mandating a single-system transmission rate for the Tallahassee and Cajun agreements, the Commission also set for public hearing petitioners' proposed formula rates under those agreements. 55 F.E.R.C. at 61,557; 57 F.E.R.C. at 61,125. The Commission determined that the 13.75% and 14% rates of return on common equity in the formula rates of the Tallahassee and Cajun agreements, respectively, "may be unjust, unreasonable, unduly discriminatory or preferential, or otherwise unlawful." 55 F.E.R.C. at 61,557; see 57 F.E.R.C. at 61,-125. Over 20 agreements previously filed by petitioners with similar rates of return, see 55 F.E.R.C. at 61,559 App. A, might also be excessive. Pursuant to § 206 of the FPA, 16 U.S.C. § 824e, the Commission thus ordered an investigation of all Southern system rate schedules containing a return on equity of 13.75% or above.

The operating companies and SCSI contested the Commission's authority to order such an investigation. They argued that settlement review procedures approved by the Commission in a 1981 letter order, subsequently made applicable to all of petitioners' formula rate contracts, see Petitioners' Brief at 43–44, prohibited such an inquiry. Specifically, they alleged that these review procedures confined FERC investigation of the return on equity component of formula rates to every third year beginning in 1984; that is, 1984, 1987, 1990, 1993 and so on. Thus, the Commission's 1991 order directing inquiry into the formula rates was barred. The Commission, however, rejected this interpretation of the 1981 settlement review procedures, positing that they do not "circumscribe the ability of the Commission itself to initiate such an investigation under section

206 of the FPA." 57 F.E.R.C. at 61,343. The ALJ, at the § 206 hearing on the formula rates, concluded, however, that the agency had failed to carry its burden of proof that the rates of 13.75% or above were excessive. 60 F.E.R.C. at 65,149, *appeal pending.*

Petitioners urge us to terminate the formula rate proceedings as violative of the 1981 settlement review procedures approved by FERC. The Commission first responds that we have no jurisdiction because the agency has yet to render a final appealable order. Alternatively, the Commission stands by its interpretation of the settlement review procedures as inapplicable to investigations initiated by the Commission under § 206. We conclude that petitioners' complaint is reviewable, but that the settlement plainly applies only to proceedings under § 205, and not to the Commission-initiated § 206 investigation ordered here.

### 1. *Finality*

Under the FPA, 16 U.S.C. § 825*l* (b), "an agency order is final for purposes of appellate review when it 'imposes an obligation, denies a right, or fixes some legal relationship as a consummation of the administrative process.'" *Papago Tribal Utility Authority v. FERC,* 628 F.2d 235, 239 (D.C.Cir.) (quoting *Cities Serv. Gas Co. v. FPC,* 255 F.2d 860, 863 (10th Cir.), *cert. denied,* 358 U.S. 837, 79 S.Ct. 61, 3 L.Ed.2d 73 (1958)), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980). FERC argues that commencement of the § 206 investigation represents merely the nonreviewable initiation of an administrative proceeding and that any injury to petitioners resulting from the investigation is speculative at this point. It points to decisions holding that orders initiating administrative proceedings under the FPA are nonfinal, nonreviewable decisions. *See FPC v. Metropolitan Edison Co.,* 304 U.S. 375, 383–85, 58 S.Ct. 963, 966–67, 82 L.Ed. 1408 (1938) (order designating hearing nonreviewable); *Niagara Mohawk Power Corp. v. FPC,* 538 F.2d 966, 970 (2d Cir.1976) (order denying motion to dismiss investigation into utility's alleged anticompetitive practices nonreviewable); *Mississippi Power & Light Co. v. FPC,* 131 F.2d 148, 149

(5th Cir.1942); *see also FTC v. Standard Oil Co.,* 449 U.S. 232, 243, 245, 101 S.Ct. 488, 495, 496, 66 L.Ed.2d 416 (1980) (*"SOCAL"*) (issuance of an administrative complaint nonfinal; review must await any cease and desist order that might ensue).

These decisions are, however, off-point. In none was the agency's initiation of administrative proceedings purportedly prohibited by express contractual agreement between the agency and the party against whom the proceedings were brought. More relevant, in light of petitioners' assertion that the Commission's investigation runs directly afoul of a bargain that the parties struck in the 1981 settlement agreement, is the line of precedent establishing that appellate courts may review FERC orders accepting rate schedule filings over so-called *Sierra–Mobile* objections that the revised rates violate existing settlements. *See ASARCO, Inc. v. FERC,* 777 F.2d 764, 771–72 (D.C.Cir.1985); *Mississippi Valley Gas Co. v. FERC,* 659 F.2d 488, 498–99 (5th Cir.1981); *Papago,* 628 F.2d at 244–45. As we explained in *Papago,* nonreviewability of the Commission's decision to accept a *Sierra–Mobile* contested rate denies the purchaser the "contractual right to purchase electric power at the agreed-upon rate during the administrative process.... [which] cannot be restored upon review of a final order," and "is effectively a final disposition of the purchaser's contractual claim of right, for the *Sierra–Mobile* question will not ordinarily be at issue again in the later ... hearing." 628 F.2d at 245. On that analysis, and because "the Commission has no discretion to accept a ... rate filing that contravenes a private contract," we have concluded that FERC's acceptance of rates that allegedly contravene existing contracts is a final, reviewable action. *Id.*

The present case falls within that doctrine. Petitioners contend that FERC's initiation of an inquiry into the formula rates denied petitioners the contractual right to be free, for intervals of three years at a time, from investigation, its attendant costs, and the specter of potentially massive refund obligations. This deprivation cannot be cured by a subsequent Commission decision that petitioners' formula rates are not excessive: the contractual right to be unfettered by investigation must remain inviolate. Moreover, the Commission has never suggested that it might reconsider its interpretation of the settlement review procedures as not barring a § 206 investigation on any appeal of the ALJ's decision, which concerns only the issue of whether Southern's formula rates were in fact excessive. *See Mississippi Valley Gas Co.,* 659 F.2d at 498. Given that petitioners' complaint raises purely legal questions of contract interpretation, we tread only lightly on FERC territory by reviewing the investigation order at this juncture. *See id.* In sum, petitioners' allegation that a FERC order has infringed upon a valuable, bargained-for right to be uninhibited by the threat of agency investigation for certain periods of time is reviewable prior to final resolution of the investigation itself.[5]

### 2. *Settlement Review Procedures*

■ On the merits, however, we find that the triennially-based settlement review procedures do not apply to this investigation at all. Under the 1981 settlement agreement, Southern agreed with other interested parties and the Commission to engage in a filing procedure for future formula rate adjustments that would bypass the normal review procedures authorized by § 205 of the FPA. More precisely, the 1981 accord included a formula which would automatically adjust the rates each year under designated schedules "to reflect changes in cost." Pursuant to the agreement, the "application of such formulary rates will not require a § 205 filing," because, as the Commission has elsewhere explained: "When the Commission accepts a formula rate as a filed rate, it grants waiver of the filing and notice requirements of section 205 of the Federal Power Act....

---

5. In a different context, the Supreme Court has explained that " '[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.' " *SOCAL,* 449 U.S. at 244, 101 S.Ct. at 495 (quoting *Renegotiation Bd. v. Bannercraft Clothing Co.,* 415 U.S. 1, 24, 94 S.Ct. 1028, 1040, 39 L.Ed.2d 123 (1974)). We must question, however, whether the Court would reach the same conclusion if the litigation expense were incurred as a direct result of an agency's violation of an express contractual provision.

**1568**

[The utility's] rates, then, can change repeatedly, without notice to the Commission, *provided* those changes are consistent with the formula." *San Diego Gas & Electric Co. v. Alamito Co.*, 46 F.E.R.C. ¶ 61,363 at 62,-129–30 (1989) (emphasis in original).

To ensure consistency with the formula, petitioners agreed to file with the Commission informational schedules detailing the annual cost projections. Each year, the Commission was entitled to institute a § 205 hearing "for the sole purpose of reviewing ... the reasonableness of the projections of cost and other information forming an input component of the formulary rate." The formula itself, however, could only be reviewed once every three years under § 205:

> If the staff of the Commission should determine that a hearing is needed to investigate such formulary rates or any component thereof, such a hearing may be requested by an appropriate filing with the Commission during the time period November 1, 1983 to January 1, 1984. SCSI and the Operating Companies agree that such a hearing can be instituted by the Commission for the purpose of reviewing, pursuant to § 205 of the Federal Power Act, the justness and reasonableness of the formulary capacity rates.... In the event the staff of the Commission requests such a hearing, the Commission may issue an order establishing procedures for such a hearing under § 205 of the Federal Power Act on or before February 1, 1984.... If the staff of the Commission does not request a hearing on the justness and reasonableness of the formulary rates during the period November 1, 1983 through January 1, 1984, or, despite such request, the Commission does not order such a hearing by February 1, 1984, the formulary rates ... will operate in accordance with their terms for the calendar years 1984, 1985 and 1986. The staff of the Commission shall have the power to request a similar investigation for the year 1987; a similar investigation for the year 1990; and at equal intervals thereafter....

The language of the settlement agreement thus makes plain that petitioners were bargaining with the Commission only with regard to the rate adjustment procedures of § 205. Pursuant to that section, a utility must file any proposed rate adjustment with the Commission, after which the Commission may, "either upon complaint or upon its own initiative without complaint ..., if it so orders, ... enter upon a hearing concerning the lawfulness of such rate." 16 U.S.C. §§ 824d(d), 824d(e). In essence, the Commission agreed with petitioners to accept the formula rate and waive the § 205 filing requirement, as well as the investigation and hearings that such filings might engender, but in return required annual informational filings and an opportunity, once every three years, to review the formula itself in a § 205 hearing.

The FERC staff's comments, made contemporaneously with the 1981 settlement pact, verify this view. As the staff explained:

> The *formulary rates* involved in this filing for service ... contain an automatic adjustment clause which would raise or lower rates automatically. If the Commission approved this formula rate filing, each increase (or decrease) thereafter would *not* be subject to a Section 205 filing where the Commission's suspension and refund discretion could be exercised. The formula would be the rate *per se* and could only be changed during its term by a Section 206 investigation where no refunds are allowed and the burden of proof is on the complaining party and Staff.
>
> The proposed Settlement remedies this situation by providing for full review of the formula at the end of each three-year interval of its operation, and in addition, a more limited review on an annual basis of each year's rate increase dictated by operation of the formula.

(Emphasis in original). Approval of the settlement was urged by the staff because

> it provides acceptance of a formula rate for a three-year interval under which the filing company will not be required to make a full ... filing each time the charge is increased as would normally be required. The components of the formula are accepted without change for at least three years. This allows some relief from regulatory overburden in the Company's view. How-

ever, the formula can be reviewed at the end of the first three-year interval and changed if it is not working properly with the burden still being on the Company in any investigation made pursuant to Section 205 of the Federal Power Act.

In other words, by agreeing to the 1981 settlement review procedures, the petitioners attained approval of their proposed formula rate, while the Commission reserved the option to conduct full-scale § 205 hearings every three years. The Cajun and Tallahassee agreements confirm this understanding. Thus, the Cajun filing states that the agreement includes

> formula rates that will allow periodic revision of the charges ... each calendar year. The annual revision will simply involve an updating of the cost components of the formula rates and calculation of the charges.... It is contemplated that this periodic calculation of the charges ... under these formula rates will not be changes in rates that would require a filing and suspension under Section 205 of the Federal Power Act.

The Tallahassee filing is similarly worded. Neither makes reference to § 206.

The investigation order challenged in this case, however, was not issued pursuant to § 205, but to § 206, which provides that "[w]henever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate ... is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate." 16 U.S.C. § 824e(a). The 1981 settlement agreement nowhere mentions § 206, and therefore does not purport to constrict the Commission's power under that section. Indeed, the FERC staff's comments explain that, in the absence of the provision for § 205 hearings every three

years, the "formula would be the rate *per se* and could only be changed during its term by a Section 206 investigation." The ALJ, in the hearing on the reasonableness of the rates of return, observed similarly that the "three-year reopener provision essentially addresses the ability of Commission Staff to request a § 205 proceeding every three years. This provision contains no explicit reference to a § 206 proceeding, whether initiated by a party, by Commission Staff, or by the Commission." 60 F.E.R.C. at 65,148. We conclude as well that the settlement review procedures did not prohibit the Commission from initiating a § 206 investigation.

In its decision denying rehearing in this case, the Commission stated that "[w]hile the settlements may grant staff the right to request an investigation every three years, they do not by their terms restrict the Commission's authority to institute an investigation pursuant to section 206 of the Federal Power Act (FPA), whenever the Commission finds it appropriate to do so. That is, staff and the Commission are not the same...." 57 F.E.R.C. at 61,342 (footnote omitted). Later, the Commission concluded that "[t]he settlement thus by its express terms limits the ability of '[t]he staff of the Commission' to request an investigation; it does not, however, circumscribe the ability of the Commission itself to initiate such an investigation under section 206 of the FPA." *Id.* at 61,343.

Two bases are identified in the Commission's order refusing to rescind the investigation: (1) the settlement review procedures do not apply to § 206; and (2) those procedures do not prohibit the Commission itself, as opposed to the Commission staff, from initiating an investigation.[6] We do not address the second ground because the first is patently supportive of the Commission's order in this case.[7] The language of the 1981 settle-

---

6. The Commission, on appeal, continues to argue both views, explaining that its "interpretation is fully supported by the language of the settlement, which does not even mention Section 206. Rather, the settlement only sets out the rights and responsibilities of the parties—including Commission staff—with respect to [petitioners'] Section 205 rate filings." FERC Brief at 35.

7. However, it is clear that the Commission-staff distinction was recognized by the parties to the

1981 agreement. There are no less than five references in the relevant paragraph of the settlement agreement to the "staff of the Commission" making a request for an investigation, but not once does the agreement suggest that the Commission is precluded from acting in the absence of such a request. As the Commission reasoned, "the settlement draws an express distinction between the staff of the Commission and the Commission itself—indicating that even Southern

ment agreement easily coincides with the Commission's position that the agreement does not apply to § 206 investigations. *Cf. Duke Power Co.,* 864 F.2d at 827 ("[T]o the extent that we are to accord deference to the Commission's greater expertise in this technical area, the Commission's interpretation [of the agreement] confirms our view....") (citation omitted).[8]

Petitioners give two reasons why this reading of the settlement review procedures is implausible. First, they argue that the agreement's restriction of "investigation[s]" to every third year must implicitly refer to § 206 investigations because "the only 'investigation' commenced by the Staff or the Commission would necessarily be under Section 206; it is the *utility* that makes filings under Section 205 to change its existing rate schedules." Petitioners' Reply Brief at 19 (emphasis in original). But, in fact, § 205 states that "[w]henever any ... new schedule is filed the Commission shall have authority, either upon complaint or upon its own initia-

tive without complaint ... to enter upon a hearing concerning the lawfulness of such rate." 16 U.S.C. § 824d(e). Thus, under the settlement agreement, the Commission could clearly, at three year intervals, initiate an investigation pursuant to § 205 into the lawfulness of the formula rates. We therefore reject the argument that the settlement agreement, which refers only to § 205 investigations, implicitly applies to § 206 investigations as well.

Second, petitioners asserted at oral argument that to bargain for relief from § 205 investigations but not § 206 investigations would have been counter-productive since it provides no assurance of relief inside the three year intervals. However, reflection suggests reasons why the settlement agreement, even though it provides relief solely from certain § 205 proceedings, might well have been considered worthwhile.[9] To begin with, as discussed above, had petitioners not agreed to § 205 investigations of the formula every three years, the Commission might not

---

Companies recognized that the two were not and are not the same." 57 F.E.R.C. at 61,343 (footnote omitted); *see also Public Utilities Comm'n v. FERC,* 817 F.2d 858, 862 (D.C.Cir.1987) (Commission and staff are not the same). Thus, it seems plain that, even if § 206 investigations were covered under the settlement agreement, the Commission could initiate such an investigation on its own motion. Petitioners counter, however, that they have evidence the Commission received advice from staff. Petitioners' Brief at 47. But as the Commission pointed out at oral argument, the Commission has both a "trial" staff, which acts as a participant in hearings before the Commission, and an "advisory" staff which assists in the drafting of opinions and orders. *See also Appalachian Power Co.,* 59 F.E.R.C. ¶ 61,313 at 62,157 (1992); GARY J. EDLES & JEROME NELSON, FEDERAL REGULATORY PROCESS 705 (2d ed. 1989). The trial staff is precluded by regulation from communicating *ex parte* with the Commission. 18 C.F.R. § 385.2202. Though we do not resolve the issue, we note that the settlement review procedures may plausibly be read to prohibit the trial staff, as a participant in the proceedings, from filing a formal request for investigation, but not to inhibit the Commission from relying upon its personal advisors in reaching its own decisions. It would certainly be odd to say that the settlement agreement recognizes the possibility of a Commission-initiated investigation, but requires that the individual commissioners themselves act without the benefit of any administrative support.

8. The deference traditionally afforded FERC interpretations of settlement agreements, *see Trans-*

*continental Gas Pipe Line Corp.,* 922 F.2d at 869; *Panhandle Eastern Pipe Line Co.,* 881 F.2d at 1118, may be inappropriate in this case because the Commission has interpreted a contract provision which purportedly relinquishes some of the agency's statutory authority. That is, there is a recognized risk in such situations that the Commission will adopt a self-serving construction to preserve or even maximize its own power. *See, e.g., National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1571 (D.C.Cir.) (recognizing that "if the agency itself were an interested party to the agreement, deference might lead a court to endorse self-serving views that an agency might offer in a post hoc reinterpretation of its contract"), *cert. denied,* 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). Because we find on our own that the 1981 settlement agreement is inapplicable to § 206 orders, there is no need to definitively determine the proper standard of review for a settlement between the Commission and a regulated subject that implicates the statutory authority of the Commission (or its staff). *Cf. Cajun Electric Power Coop., Inc. v. FERC,* 924 F.2d 1132, 1136 (D.C.Cir.1991).

9. We note that the Commission has approved, in another case, settlement review procedures which restrict § 205 hearings but leave open the possibility of § 206 investigations, suggesting that such arrangements are not illogical. *See Arkansas Power & Light Co.,* 24 F.E.R.C. ¶ 63,057 (1983), *aff'd by* 25 F.E.R.C. ¶ 61,070 (1983).

have approved their proposed formula rates at all. Next, important differences exist between § 205 investigations and § 206 investigations. While the proponent of a rate change under § 206, here FERC, has the burden of proving that the existing rate is unlawful, *see Seminole Electric Cooperative, Inc.*, 32 F.E.R.C. ¶ 63,087 at 65,334 (1985); *see also Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 187 (D.C.Cir.1986), the party filing a rate adjustment with the Commission under § 205 bears the burden of proving the adjustment is lawful, *see* 16 U.S.C. § 824d(e); *Winnfield v. FERC*, 744 F.2d 871, 877 (D.C.Cir.1984). In addition, at the time the settlement agreement was entered into, the Commission's remedial authority under the two sections was quite different. As explained by FERC in 1987:

> Generally speaking, section 205 covers rate filings by jurisdictional public utilities, invokes just and reasonable standards for filed rates, and confers on the Commission the authority to suspend and investigate rate filings and to order refunds. Section 206 empowers the Commission, on its own motion or upon complaint, to investigate rates and to determine the lawfulness of such rates. There are no provisions for the suspension of rates or for refunds, and any changes in the rates will be prospective only.

*Orange and Rockland Utilities, Inc.*, 40 F.E.R.C. ¶ 63,053 (1987); *see also Girard v. FERC*, 790 F.2d 919, 920 (D.C.Cir.1986).[10] Therefore, by contracting in 1981 to limit the Commission to one § 205 hearing on the

formula every three years, the petitioners could significantly reduce the possibility of Commission-ordered suspensions and refunds. The petitioners would still be susceptible to a § 206 investigation, but in that eventuality would not bear the burden of proof and would risk only prospective rate changes.[11]

## III. CONCLUSION

To recap, we believe the Commission reasonably found, based upon substantial evidence in the record, that an off-system sales contract bound an entire system of commonly owned operating companies, and therefore that a cumulative transmission rate based upon the costs of the individual operating companies was not just and reasonable. In its place a revised rate should be filed reflecting a single system transmission rate methodology. We also find that a FERC order that purportedly violates a valuable contractual right to be free from Commission investigations is a final, appealable agency action. However, we agree with the Commission that the settlement review procedures previously agreed to by petitioners and the Commission do not prohibit the Commission from initiating its own § 206 investigation into the Southern system's rates of return.

The petition for review is therefore

*Denied.*

---

**10.** In 1988, Congress amended § 206 to provide that "[a]t the conclusion of any proceeding under this section, the Commission may order the public utility to make refunds of any amounts paid, for the period subsequent to the refund effective date [set by the Commission] ... in excess of those which would have been paid under the just and reasonable rate .. which the Commission orders to be thereafter observed and in force." 16 U.S.C. § 824e(b), as amended by Pub.L. No. 100-473, 102 Stat. 2299 (1988); *see also Anaheim v. FERC*, 941 F.2d 1234, 1238 (D.C.Cir. 1991); *East Tennessee Natural Gas Co. v. FERC*, 863 F.2d 932, 945 n. 21 (1988).

**11.** Petitioners argued to the ALJ, at the hearing on the lawfulness of the formula rates, that implicit in the settlement agreement was a require-

ment that any investigation initiated outside of the designated three year interval result in modification of the rates only if "necessary in the public interest," rather than the usual, and lower, "just and reasonable" standard. The ALJ agreed, concluding that although the Commission could launch a § 206 investigation under the agreement, the intent of the parties was "to restrict a Commission initiated § 206 investigation to the public interest." 60 F.E.R.C. at 65,-148. We offer no views on this decision, which is pending on appeal before the Commission, but mention it only to suggest that if the ALJ is correct about the parties' intent, then the petitioners enjoy yet another important benefit from bargaining over a safe haven from full § 205 proceedings, even though they did not totally eliminate the possibility of § 206 investigations.