PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA; Office of the Consumers' Counsel, State of Ohio, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Indiana Gas Company, Inc.; Panhandle Eastern Pipe Line Company; Trunkline Gas Company; Algonquin Gas Transmission Company; Texas Eastern Transmission Corporation; Associated Gas Distributors; Citizens Gas & Coke Utility; Public Service Electric & Gas Company; Cincinnati Gas & Electric Company; Union Light, Heat and Power Company; Lawrenceburg Gas Company; Southern California Gas Company; Washington Gas Light Company; American Gas Association; Columbia Gas Transmission Companies Gas Research Institute; Interstate Natural Gas Association of America; Mitchell Energy Corporation; Natural Gas Pipeline Company of America; Process Gas Consumers Group; American Iron and Steel Institute; Georgia Industrial Group; Alabama Gas Corporation; Bay State Gas Company, et al.; Philadelphia Gas Works; Williams Natural Gas Company; ANR Pipeline Company; Colorado Interstate Gas Company; Conoco Inc.; Marathon Oil Company; Wisconsin Distributor Group; Peoples Gas Light and Coke Company; Pacific Gas Transmission Company, Intervenors.

PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA; Office of the Consumers' Counsel, State of Ohio, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Conoco Inc.; Indiana Gas Company, Inc.; Southern California Gas Company; Gas Research Institute; Northern Natural Gas Company; Florida Gas Transmission Company; Transwestern Pipeline Company; Natural Gas Pipeline Compa-

ny of America; Western Resources, Inc.; Columbia Gas Transmission Companies; Interstate Natural Gas Association of America; Panhandle Eastern Pipe Line Company; Texas Eastern Transmission Corporation; Trunkline Gas Company; Algonquin Gas Transmission Company; ANR Pipeline Company; Pacific Gas and Electric Company; Colorado Interstate Gas Company; American Gas Association; Brooklyn Union Gas Company; Cincinnati Gas & Electric Company; Union Light, Heat and Power Company; Lawrenceburg Gas Company; Process Gas Consumers Group; American Iron and Steel Institute; Georgia Industrial Group; United Distribution Companies, Intervenors.

Nos. 92–1647, 93–1493.

United States Court of Appeals, District of Columbia Circuit.

Argued March 21, 1994.

Decided May 31, 1994.

Arocles Aguilar argued the cause, for petitioners. With her on the briefs were Edward W. O'Neill, Harvey Y. Morris, Barry E. Cohen, Margaret Ann Samuels and Joseph P. Serio.

Samuel Soopper, Atty., F.E.R.C., argued the cause, for respondent. With him on the brief was Jerome M. Feit, Sol., F.E.R.C.

James M. Broadstone, argued the cause, for intervenor Gas Research Institute. With him on the brief were Steven M. Kramer and William H. Kockenmeister.

Ronald E. Christian and Leja D. Courter entered an appearance, for intervenor Indiana Gas Co., Inc.

Henry S. May, Jr. entered an appearance, for intervenors Panhandle Eastern Pipe Line Co., Trunkline Gas Co., Algonquin Gas Transmission Co., and Texas Eastern Transmission Corp.

Merlin Everett Remmenga entered an appearance, for intervenors Panhandle Eastern Pipe Line Co. and Trunkline Gas Co.

Judy M. Johnson entered an appearance, for intervenors Panhandle Eastern Pipe Line Co., Trunkline Gas Co., and Algonquin Gas Transmission Co.

F. Nan Todd Wagoner entered an appearance, for intervenor Texas Eastern Transmission Corp.

Rebecca S. Haney entered an appearance, for intervenor Algonquin Gas Transmission Co.

Frederick Moring entered an appearance, for intervenor Associated Gas Distributors.

Steven M. Sherman entered an appearance, for intervenor Citizens Gas & Coke Utility.

Kenneth D. Brown entered an appearance, for intervenor Public Service Elec. & Gas Co.

Kenneth Richard Carretta, William Augustus Williams, John Brooks Harrington, James J. Mayer, and John G. Banner entered an appearance, for intervenors Cincinnati Gas & Elec. Co., Union Light, Heat and Power Co., and Lawrenceburg Gas Co.

Michael A. Cartelli, David James Gilmore, and David Leo Huard entered an appearance, for intervenor Southern California Gas Co.

Telemac Nicholas Chryssikos, Robert B. Evans, and John Brian Keane entered an appearance, for intervenor Washington Gas Light Co.

David J. Muchow and Eric N. Wise entered an appearance, for intervenor American Gas Ass'n.

David C. Keenan, Stephen Jay Small, Giles D.H. Snyder, and Frederic J. George entered an appearance, for intervenor Columbia Gas Transmission Companies.

Jean Elizabeth Sonneman and John Hubbard Cheatham, III entered an appearance, for intervenor Interstate Natural Gas Ass'n of America.

Paul F. O'Konski and Randolph C. Bruton, Jr. entered an appearance, for intervenor Mitchell Energy Corp.

Paul Korman, Georgetta Jordan Baker, Emmitt C. House, Paul Warren Mallory, and Paul E. Goldstein entered an appearance, for intervenor Natural Gas Pipeline Co. of America.

William Howard Penniman entered an appearance, for intervenors Process Gas Consumers Group, American Iron and Steel Institute, and Georgia Industrial Group.

Jeffrey D. Komarow entered an appearance, for intervenor Alabama Gas Corp.

Cheryl Lamae Jones and Barbara K. Heffernan entered an appearance, for intervenors Bay State Gas Co., et al.

Allen Weinberg entered an appearance, for intervenor Philadelphia Gas Works.

John Howard Cary entered an appearance, for intervenor Williams Natural Gas Co.

Daniel Francis Collins and Howard Lawrence Nelson entered an appearance, for intervenors ANR Pipeline Co. and Colorado Interstate Gas Co.

G. Mark Cook entered an appearance, for intervenor Colorado Interstate Gas Co.

J. Paul Douglas and Bruce Alan Connell entered an appearance, for intervenor Conoco Inc.

Thomas Burns Magee and Jon Lodwick Brunenkant entered an appearance, for intervenor Marathon Oil Co.

Mark Kevin Lewis and Bruce Fraser Kiely entered an appearance, for intervenor Wisconsin Distributor Group.

Thomas M. Patrick entered an appearance, for intervenor Peoples Gas Light and Coke Co.

David Warren Anderson entered an appearance, for intervenor Pacific Gas Transmission Co. and Pacific Gas and Elec. Co.

Patrick G. Golden entered an appearance, for intervenor Pacific Gas Transmission Co.

Martin John Marz and Sherrie N. Rutherford entered an appearance, for intervenors Northern Natural Gas Co., Florida Gas Transmission Co., and Transwestern Pipeline Co.

Martin J. Bregman entered an appearance, for intervenor Western Resources, Inc.

Michael W. Hall entered an appearance, for intervenor Brooklyn Union Gas Co.

Christopher John Barr, Kristine Leah Delkus, and Roberta Lee Halladay entered an appearance, for intervenor United Distribution Companies.

Before: MIKVA, Chief Judge, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Petitioners, two state agencies authorized to represent the interests of residential consumers, assert that FERC acted arbitrarily and capriciously when it approved funding

mechanisms for the Gas Research Institute that allegedly unduly discriminate against those consumers. We deny the petitions for review.

## I.

Most interstate natural gas pipelines are members of the Gas Research Institute (GRI), a scientific nonprofit corporation that administers a comprehensive gaseous fuels research program. The Commission authorizes regulated pipelines to pass research, development, and demonstration costs on to ratepayers, *see* 18 C.F.R. § 154.38(d)(5) (1993); *Process Gas Consumers Group v. FERC*, 866 F.2d 470, 471 (D.C.Cir.1989), if such research will ultimately benefit ratepayers. *See id.* Accordingly, GRI member pipelines collect FERC-approved surcharges on gas that flows through their pipelines in order to pay for GRI's costs. Pipeline participation in GRI is voluntary. *See ANR Pipeline Co.*, 58 F.E.R.C. ¶ 61,228 at 61,722, *reh'g denied*, 59 F.E.R.C. ¶ 61,095 (1992).

From 1978 through 1992, GRI funding had been secured through the use of a uniform volumetric surcharge on the gas flowing through member pipelines, except where one GRI member served another. *See, e.g., Gas Research Inst., Order on Proposed Funding Mechanism*, 60 F.E.R.C. ¶ 61,203 at 61,696, *aff'd*, 61 F.E.R.C. ¶ 61,121 (1992). FERC, by selecting and continually approving this method of procuring GRI funding, had attempted to meet two aims: to ensure stable GRI funding while spreading the costs of research "as evenly as possible and over the broadest possible base" of natural gas services. 60 F.E.R.C. at 61,702. The use of a surcharge on top of a regulated price for the natural gas ensured that ratepayers ultimately paid GRI's research costs; pipeline companies were simply conduits for funds from customers to GRI. *See In Re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1062 (3rd Cir.1993).

The natural gas industry has changed considerably since the days in which FERC approved the uniform volumetric surcharge. *See Associated Gas Distrib. v. FERC*, 824 F.2d 981, 1007–08 (D.C.Cir.1987), *cert. denied, Interstate Natural Gas Ass'n v. FERC*, 485 U.S. 1006, 108 S.Ct. 1468, 1469, 99 L.Ed.2d 698 (1988). With deregulation and the onset of competition in the market, the previous regime in which pipelines merely passed on the costs to ratepayers was no longer viable. Where natural gas prices were set by FERC, adding a GRI surcharge to the price charged ratepayers did not affect the revenue flowing to pipeline coffers. In an era of competitive pricing, however, a pipeline might no longer be able to pass on the entire surcharge to its customers. Since customers could demand a discount below the price ceiling established by FERC, pipelines selling discounted gas asserted that they were paying a portion or all of the GRI surcharge. Faced with this situation, two pipelines resigned from GRI effective January 1, 1993, *see ANR Pipeline Co.*, 58 F.E.R.C. at 61,723 & n. 10, and many others threatened to follow suit. *See* 60 F.E.R.C. at 61,699–70.

Faced with the prospect of massive member resignations, GRI proposed a modification of its funding mechanism for 1993. The proposal contemplated collecting 75% of GRI's funding needs through the established volumetric surcharge. However, pipelines who sold discounted gas would be able to avoid part or all of the GRI surcharge, depending upon the amount of discount. In other words, on discounted transactions, pipelines would remit to GRI only the amount by which the price actually charged to the customer exceeded the non-discounted price of the gas (excluding the surcharge), up to the amount of the GRI surcharge.[1] *See* 60 F.E.R.C. at 61,699. To recover the funds that would be lost due to discounted transactions (an estimated shortfall of $43 million), GRI proposed a new surcharge applied to

---

1. For instance, suppose the non-discounted price of a given volume of gas was $1.00 and the GRI surcharge was 5 cents for that volume. If the pipeline charged its customers 99 cents for that volume, no money would be passed onto GRI. If however, the pipeline charged $1.03, three cents would go to GRI. If the pipeline did not dis-

demand charges paid by firm customers[2] which would presumably cover the remaining 25% of the budget.

The Commission issued an order (the Interim Funding Order) accepting GRI's proposed funding scheme for 1993 stating that "at this time [it is] an appropriate method of ensuring the stability of GRI's present funding, of allowing GRI to hold its membership together . . ., and at the same time of spreading the responsibility for funding" among all those who benefit from GRI research. 60 F.E.R.C. at 61,702.

Petitioners sought rehearing of the Commission's order, contending that the new mechanism was unsupported by the record evidence and also unfairly shifted costs from customers who could demand discounts to those that were "captive," *i.e.*, those who were not in a position to demand discounts. (Petitioners are purportedly representing the interests of these captive customers who are forced to bear a larger portion of GRI's budget.) FERC denied the rehearing request and affirmed its earlier conclusion that cost shifting was essential to stem pipeline resignations from GRI. *See Gas Research Inst., Order Denying Rehearing,* 61 F.E.R.C. ¶ 61,121 at 61,444 (1992). If the resignations continued, there would be "a major erosion of the customer base over which the costs of GRI are recovered," and thus the new funding mechanism was consistent with the Commission's policy of spreading the costs of GRI as evenly and as broadly as possible. *Id.* The Commission also dismissed petitioners' claim that the new funding system was not supported by the record and noted that the

Interstate Natural Gas Association of America (INGAA) survey data, which was employed to determine the amount of the revenue shortfall expected due to discounting, was of the same type used by the Commission in years past when it considered GRI funding. *Id.* at 61,445.

The Interim Funding Order not only approved the GRI funding mechanism for 1993, but also directed that a settlement conference be convened under the auspices of an administrative law judge to develop a more permanent system of GRI funding. After deliberating with the various interested parties, the Chief ALJ at FERC submitted a final report to the Commission. *See Gas Research Inst., Final Report of Chief Judge and Certification of Settlement,* 61 F.E.R.C. ¶ 63,024 (1992). The report proposed a mechanism for funding GRI which garnered approximately 50% from a volumetric surcharge and the remainder from a demand surcharge. *See id.* at 65,172. As with the interim funding mechanism, if a discount is significant enough, pipelines would be able to avoid the surcharges altogether. But firm customers would pay a volumetric surcharge and a demand surcharge that would be adjusted to account for the customer's load factor: Low load factor customers would pay a higher surcharge than high load customers.[3] *See id.* Interruptible customers who, according to the record, were and are more likely to gain discounts (and who have lower priority transportation rights on pipelines pursuant to short-term contracts) would face only a volumetric surcharge. So-called small customers (as defined in the pertinent inter-

count at all, that is it charged $1.05, five cents would flow to GRI.

**2.** Demand or reservation charges are a fixed amount paid by customers to an interstate gas pipeline for the rights to firm sales or transportation on that pipeline, regardless of the volume delivered. Demand charges are paid by those who want to reserve the right to purchase gas, whether or not gas is actually acquired. Such customers are known as firm customers.

Firm sales or firm transportation are the highest priority transportation rights acquired by local gas distribution companies and pipelines, usually involving long-term contracts for pipeline capacity.

**3.** A customer's load factor refers to the "percentage relationship of its average daily demand to its maximum daily demand." *Public Serv. Comm'n v. FERC,* 813 F.2d 448, 452 n. 3 (D.C.Cir.1987) (quotations omitted). High load factor customers have a greater correlation of average use to peak use. In other words, such customers generally use about the same amount of gas consistently over time. Low load factor customers, as might be expected, have a lower correlation between average use and peak use. The ALJ defined as high load factor customers those whose load factors exceed 50%. Low load customers were the remainder. Presumably low load firm customers have less bargaining power and are therefore less capable of garnering discounts.

state pipeline's tariff) would face a uniform volumetric surcharge, one equivalent to the volumetric surcharge paid by the firm customers of two cents per Decatherm of natural gas. *Id.* at 65,173. The ALJ characterized the settlement as a "true compromise between those parties who wanted nothing but a volumetric surcharge and those parties who wanted nothing but a demand surcharge." *Id.* at 65,164. The ALJ also emphasized the steps taken to minimize cost-shifting, such as the separate small customer surcharge and the variable demand surcharges for high and low load factor customers. *Id.*

After considering the settlement and petitioners' opposition to it, FERC ratified the funding mechanism for 1994 and 1995 (the 1994–95 Funding Mechanism), declaring that "[a] purely volumetric surcharge would once again lead pipelines to resign from GRI and would not adequately ensure GRI funding." *Gas Research Inst., Order on Contested Settlement,* 62 F.E.R.C. at ¶ 61,280 at 62,804. The Commission concluded that the 50% demand–50% volumetric funding scheme was the best method of spreading the responsibility for GRI funding over the broadest base and was consistent with the realities of the situation, namely the pipelines' ability to abandon GRI. *Id.* Though some cost-shifting from discounted customers to captive customers would necessarily ensue, FERC, like the ALJ, noted that the settlement contained mechanisms which would ameliorate the effects of the shifts. *Id.* at 62,805–07. The Commission promised to revisit GRI's funding for 1996 and beyond. Several parties (including petitioners) not happy with FERC's decision to ratify the settlement, filed for a rehearing. The Commission rejected the rehearing request, maintaining that the settlement funding mechanism did not unduly discriminate against captive customers, while favoring interruptible and discount customers. *See Gas Research Inst., Order on Rehearing,* 63 F.E.R.C. ¶ 61,316 at 63,147 (1993).

Two state agencies which represent the interests of natural gas customers now petition us for review of the Commission's Interim Funding Order and the 1994–95 Funding Mechanism and its orders denying rehearing therefor. We consolidated the petitions for review, which challenge generally the Commission's departure from the uniform volumetric surcharge as the sole mechanism to fund GRI.

## II.

■ According to petitioners, FERC's approval of the two funding orders constituted undue discrimination in violation of 15 U.S.C. §§ 717c(b), 717d(a) (1988). It is argued that the Commission unreasonably accepted the pipelines' unsupported assertion that pipeline shareholders were paying the volumetric surcharge rather than the ratepayers. The state agencies also assert that there was no basis for the Commission to suppose that there would have been massive pipeline resignations from GRI had the volumetric surcharge remained in place. Rather than altering GRI's funding scheme, petitioners would have the Commission continue to authorize a purely volumetric surcharge. If the threatened resignations came to pass, FERC could then take appropriate steps to cope with the resulting funding shortfall.

Whether discounting actually causes the surcharge to be shouldered entirely by the pipeline shareholders is of little moment.[4] If pipelines were about to resign from GRI (whether or not because they believed that their stockholders were bearing the brunt of the surcharge), that is all that matters. In the newly competitive price-cutting regime, many pipelines quite understandably questioned the wisdom of continued participation in GRI. After all, GRI costs originally were to be passed fully on to ratepayers. When regulation of gas prices was the rule, GRI surcharges on all transported gas put no pipeline at a competitive disadvantage. But when the gas market began to experience limited competition, pipelines no longer easi-

---

4. Determining the actual incidence of the surcharge is a rather complicated empirical question which depends on the elasticity of demand for natural gas. The more competitive the gas market, the more likely the pipelines will bear the surcharge.

ly passed on the costs of GRI to their customers.

As noted earlier, two pipelines who sold discounted gas detariffed their GRI surcharge ostensibly to avoid having to swallow the surcharge. Other pipelines which sold gas competitively also claimed that their owners were paying the GRI surcharge and threatened that if the existing funding mechanism was not altered, they too would abandon GRI. In the face of a possible plunge in GRI funding, FERC successively adopted the Interim and 1994–95 Funding Mechanisms, hoping to stem the impending tide of resignations.

Predictions regarding the actions of regulated entities are precisely the type of policy judgments that courts routinely and quite correctly leave to administrative agencies. *See Wisconsin's Envtl. Decade, Inc. v. SEC,* 882 F.2d 523, 527 (D.C.Cir.1989); *Public Citizen, Inc. v. FAA,* 988 F.2d 186, 196–97 (D.C.Cir.1993). When it comes to forecasting behavior of the pipelines in an increasingly competitive market for natural gas, we are quite unwilling to challenge FERC's considered judgment. Our reluctance is especially heightened because some pipelines have already done what the state agencies claim is utterly unrealistic—resign from GRI and remove the volumetric surcharge from the gas transported through their pipelines. Given the threatened large-scale resignation of pipelines from GRI and the hard reality that pipelines had already withdrawn, it cannot be said that FERC acted unreasonably when it altered GRI's funding mechanism.[5]

Petitioners nevertheless assert that FERC's approval of the Interim Funding Mechanism and the Contested Settlement amounted to an abdication of FERC's duty to protect consumers. *See Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S.

591, 611–12, 64 S.Ct. 281, 291–92, 88 L.Ed. 333 (1944). But, the state agencies never openly challenged the underlying desirability of GRI itself. Without such a frontal challenge to GRI, FERC could not be expected to revisit its earlier determination that GRI inured to the benefit of all ratepayers—including consumers. Given the unchallenged goal of supporting GRI, the question then became how GRI could remain viable. And FERC was certainly entitled, *under the circumstances,* to conclude that some ratepayers would be better off paying a greater share of GRI costs than before rather than losing the products of GRI research. Thus, even if it could be said that the settlement "discriminated" against those consumers whose gas came from captive distribution companies, we cannot conclude that FERC's approval of the settlement sanctioned "undue" discrimination since FERC acted reasonably in this unique situation.

To be sure, when FERC approved the contested settlement (which seems to bear some resemblance to a collective bargaining agreement),[6] it did not set forth its reasoning in an elegant fashion. But FERC sanctioned the settlement because it faced a difficult choice: either accept the 50% volumetric–50% demand surcharge settlement agreement (with its provisions allowing discounters to completely avoid any surcharge) or risk a potential avalanche of pipeline resignations which would greatly destabilize GRI funding.[7] Given these alternatives, the Commission quite reasonably chose to accept the settlement. We thus reject petitioners' insistence that the approval of the two funding orders constituted an unexplained departure from prior GRI funding policy to employ a uniform volumetric surcharge. The Commission provided a reasoned explanation; petitioners slight that explanation simply be-

---

5. Petitioners do not assert that FERC legally could or should compel pipelines to contribute to GRI.

6. We note that most parties who participated in the settlement discussion (including the National Association of Regulatory Utility Commissioners) supported the agreement. Only two state commissions (petitioners) have sought review.

7. We note that the effect of FERC's decision to select option 1 may not be that different than the effect of choosing option 2. In either case, pipelines which transmit to customers who can demand discounts will end up not collecting or any of the costs of GRI. But at least the former option leaves open the possibility that with a rise in the market price of natural gas, the pipelines who formerly avoided the tariff might yet still contribute something to GRI.

cause they do not welcome the underlying change in Commission policy.[8]

■ The state agencies also challenge FERC's acceptance of the contested settlement agreement, contending that the consent lacked "substantial evidence" as required by Subpart F of FERC's Rules of Practice and Procedures, 18 C.F.R. 385.602(h)(1) (1993). In accepting the settlement, FERC is alleged to have relied upon data and assumptions contained in Appendix A of the Settlement Agreement, information which was never part of the record. *See Gas Research Inst., Final Report of Chief Judge and Certification of Settlement,* 61 F.E.R.C. ¶ 63,024 at 65,175–77 (1992). We, however, agree with the Commission's assertion that the data and assumptions were not relied upon in approving the settlement, but were merely indicative of how GRI might implement the final funding agreement.

■ FERC's reliance on the INGAA pipeline survey, in order to determine the GRI funding shortfall that would ensue when discounting pipelines no longer were required to collect GRI surcharges, is also called into question. Asserting that the INGAA pipeline survey was accepted uncritically by FERC, petitioners believe that a hearing was necessary before FERC determined the resulting shortfall in revenues to GRI. We disagree. The survey information submitted by INGAA was of the same type relied upon by FERC since 1978. *See Gas Research Inst., Order Denying Rehearing,* 61 F.E.R.C. ¶ 61,121 at 61,445 (1992). Knowing that it had continuously and successfully relied upon such data for more than a decade, the Commission did not need to call a hearing merely because some thought the data less than satisfactory.

■ Nor did FERC need to conduct a hearing to discuss the cost-shifting impacts of the orders. Petitioners cite a study submitted by the Philadelphia Electric Company (PECO) which concludes that residential/commercial customers would pay 85% of the GRI's total budget as a result of the final funding order. FERC considered the PECO study and concluded that it did not raise a material issue of fact. FERC rejected PECO's conclusions because they were based on the unrealistic assumption that industrial users would no longer have to pay the demand surcharge, leaving residential and commercial customers to fund all of the amount that was supposed to be garnered from the demand surcharge. *See Gas Research Inst., Order Denying Rehearing,* 63 F.E.R.C. ¶ 61,-316 at 63,147–48 (1993). Petitioners' mere assertion that a material issue of fact remains will not enable them to force a hearing, particularly when we have said that:

> " '[w]ithout evidence of an abuse of discretion, we defer to an agency's determination that a controversy raises' no disputed issues. *Vermont Dep't of Pub. Serv. v. FERC,* 817 F.2d 127, 140 (D.C.Cir.1987). And 'even where there are such disputed issues, FERC need not conduct ... a hearing if they may be adequately resolved on the written record.' " *Moreau v. FERC,* 982 F.2d 556, 568 (D.C.Cir.1993).

*Alabama Power Co. v. FERC,* 993 F.2d 1557, 1565 (D.C.Cir.1993).

\* \* \* \* \* \*

Petitioners have sought to portray FERC's GRI funding orders as arbitrary and capricious merely because those orders treated various consumers of natural gas differently. Given the loaded gun the pipelines were pointing at GRI, FERC could do very little but what it did, namely ratify the proposed

---

**8.** We also reject the notion that the Commission failed to explain the 1994–95 Funding Mechanism's shift of costs away from interruptible customers and towards firm customers. The Commission approved the shift of costs *"as part of the overall settlement." Gas Research Inst., Order on Contested Settlement,* 62 F.E.R.C. ¶ 61,280 at 62,-805 (1993) (emphasis added). Had the Commission decided not to accept the settlement, the ever-present fear that the pipelines would resign would remain. After all, many had conditioned their continued participation in GRI on the Commission's acceptance of the settlement. Thus, FERC provided the same justification for the cost shift from interruptibles to firm customers that it did for the shift from discounted customers to non-discounted customers. As we have noted, shifting costs from interruptibles to firm customers presumably would provide a more reliable stream of funds flowing into GRI coffers, as interruptibles were more likely to receive discounts and thus avoid the GRI surcharge altogether. Given this reality, it made sense to shift more of the funding burden onto firm customers.

funding mechanisms. Accordingly, we dismiss the petitions for review and affirm the Commission's orders.